United States Courts
Southern District of Texas
FILED

*February 22, 2022*

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURTS
~~EASTERN~~ *Southern* DISTRICT OF TEXAS
_____ DIVISION

Walmart Distribution Center 7036
_____

_____

_____

Name of Plaintiff(s)

vs

Joe Gaggos Jr
_____

_____

_____

Name of Defendant(s)

Case Number: # 493-2021-00381
_____

## COMPLAINT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

Note: If plaintiff is alleging employment discrimination based on race or color, please also see 42:U.S.C. 1981

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination.  Jurisdiction is specifically conferred on the court by 42 U.S.C. 2000e-5.  Equitable and other relief are also sought under 42 U.S.C. 2000e-5(g).

2..     Plaintiff,   Walmart Distribution Center 7036_____, is a citizen of the United States
            (name of plaintiff)

and resides at 2226 FM 3538_____, Sealy_____,
                      (street address)                                          (city)

Austin_____, Texas_____, 77474____, (979) 885-4300____.
   (county)              (state)            (zip)            (telephone)

3..     Defendant,  Joe Gaggos Jr _____, resides at, or its business is
                    (name of defendant)

located at  1590 Hintz Rd _____, Sealy _____,
                         (street address)                              (city)

Austin _____, Texas _____, 77474 ____, (713) 594-3444 .
   (county)              (state)        (zip)        (telephone)


4.      Plaintiff sought employment from the defendant or was employed by the defendant

at  2226 FM 3538 _____, Sealy _____,
              (street address)                           (city)

Austin _____, Texas _____     77474
   (county)              (state)         (zip)

5.      Defendant discriminated against plaintiff in the manner indicated in paragraphs 9 and 10

of the complaint on or about  May 1, 2018 _____.
                                    (month, day, year)

6.      Plaintiff filed charges against the defendant with the Equal Employment Opportunity
        Commission charging defendant with the acts of discrimination indicated in paragraphs
        9 and 10 of this complaint on or about  February 11, 2021 _____.
                                              (month, day,  year)


7.      The Equal Employment Commission issued a Notice of Right to Sue which was
        received by plaintiff on  January 5, 2022 _____.
                                     (month day, year)

8.    Because of plaintiff's (1) _____ race, (2) _____ color, (3) _____ sex,

(4) _____ national origin,   defendant:

a.    _____ failed to employ plaintiff.

b.    __X__ terminated plaintiff's employment.

c.    _____ failed to promote plaintiff.

d.    _____ Other _____

_____

_____

9.    The circumstances under which the defendant discriminated against plaintiff were as follows:

1) Follow Federal Motor Carrier Safety Regulation on sleep apnea policy.

2) Walmart Requirements for sleep apnea policy,(, unconstitutionala).

3) Refusing to be calibrated with CPAP machine

4) Refusing concerns regarding harmful effecting experiencing  driver complaint on CPAP.

5) Threatening and total harassment to keep a job.

6) Refusing to file workman's compensation.

7) Unemployment benefits.

8) Social Security benefits.

9) CPAP machine on recall.

10) Endangering public safety.

(11) Unnecessary surgery to keep a job

10.    The acts set forth in paragraph 9 of this complaint:

     a.    _____    are still being committed by defendant.

     b.    _____    are no longer being committed by defendant.

     c.    __X__    defendant may still be committing the acts.

11.    Plaintiff attaches to this complaint a copy of the charges filed with the Equal
Employment Opportunity Commission which charges are submitted as a brief statement
of the facts supporting this complaint.  WHEREFORE, Plaintiff prays that the Court
grant the following relief to the plaintiff:

     a.    _____    Defendant be directed to employ plaintiff.

     b.    _____    Defendant be directed to re-employ plaintiff.

     c.    _____    Defendant be directed to promote plaintiff.

     d.    _____    Defendant be directed to _REIMBURSE_____   and that the

Court grant such relief as may be appropriate, including injunctive orders,

damages, costs and attorney's fees.

_____

(Signature of Plaintiff)

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Joe R. Gaggos, Jr.<br>1590 Hintz Rd<br>Sealy, TX 77474 | From: | Houston District Office<br>Mickey Leland Building<br>1919 Smith Street, 7th Floor<br>Houston, TX 77002 |
|---|---|---|---|

| | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 493-2021-00381 | **Gerard Ladera,**<br>**Investigator** | **(346) 327-7656** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Gerard Ladera*
Digitally signed by Gerard Ladera
DN: cn=Gerard Ladera, o=Houston District Office,
ou=EEOC, email=gerard.ladera@eeoc.gov, c=US
Date: 2022.01.05 07:39:41 -06'00'

For | January 5, 2022

| Enclosures(s) | **Rayford O. Irvin,**<br>**District Director** | *(Date Issued)* |
|---|---|---|

cc:
**Atty. Sanaa Khan**
**WALMART STORES INC**
**2301 McGee Street Ste. 800**
**Kansas City, MO 64108**

**Gabrielle Klepper, Esq.**
**SPIELBERGER LAW GROUP**
**4890 W. Kennedy Blvd., Suite 950**
**Tampa, FL 33609**

**Lowell Keig, Executive Director**
**TWC / Civil Rights Division**
**101 E. 15ᵗʰ Street, Room 144-T**
**Austin, TX 78778**

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.   *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"  now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➤ **Only one** major life activity need be substantially limited.

➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**

➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

**"Regarded as" coverage:**

➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:  Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Joe R. Gaggos, Jr.<br>1590 Hintz Rd<br>Sealy, TX 77474 | From: Houston District Office<br>Mickey Leland Building<br>1919 Smith Street, 7th Floor<br>Houston, TX 77002 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 493-2021-00381 | **Gerard Ladera,**<br>**Investigator** | (346) 327-7656 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Gerard Ladera*
Digitally signed by Gerard Ladera
DN: cn=Gerard Ladera, o=Houston District Office,
ou=EEOC, email=gerard.ladera@eeoc.gov, c=US
Date: 2022.01.05 07:39:41 -06'00'

For    January 5, 2022

**Rayford O. Irvin,**
**District Director**

*(Date Issued)*

Enclosures(s)

cc:
**Atty. Sanaa Khan**
**WALMART STORES INC**
**2301 McGee Street Ste. 800**
**Kansas City, MO 64108**

**Gabrielle Klepper, Esq.**
**SPIELBERGER LAW GROUP**
**4890 W. Kennedy Blvd., Suite 950**
**Tampa, FL 33609**

**Lowell Keig, Executive Director**
**TWC / Civil Rights Division**
**101 E. 15th Street, Room 144-T**
**Austin, TX 78778**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS  --  Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION  --  Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ **"Regarded as"** coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT 1



FORMS | CONTACT US | MEDIA | FMCSA PORTAL | DOT.GOV

**U.S. Department of Transportation**
**Federal Motor Carrier Safety Administration**

Search All FMCSA Sites

SAFETY & SECURITY

Home  Safety & Security  ....

## *Sleep Apnea and Commercial Drivers*

🖨 Print

**⬆ Safety & Security**

Spotlight on Sleep Apnea

**Drivers**

Snoring - No Laughing Matter

When Snoring is More Than a Nuisance

High Blood Pressure & Heart Disease

Talking with Your Doctor

How's Your Sleep?

**Industry**

Sleep Apnea & Commercial Drivers

Recognize the Dangers of Sleep Apnea (PDF)

Prevalence of Sleep Apnea Among Truck Drivers (PDF)

**Tools & Resources**

Drowsy Driving Quiz

Sleep Apnea Fact Sheet

Sleep Diary (PDF)

Driving When You Have Sleep Apnea

Poster: Dangers of Sleep Apnea (PDF)

*Do you snore? Do you feel sleepy during the day? Are you over 40 or overweight? If you answered yes to these questions, you may be at risk for obstructive sleep apnea.*

Sleep apnea is a breathing-related sleep disorder that causes brief interruptions of breathing during sleep. These pauses in breathing can last at least 10 seconds or more and can occur up to 400 times a night. Sleep apnea is a serious, potentially life-threatening condition that often goes unrecognized and undiagnosed.

The Federal Motor Carrier Safety Administration (FMCSA) says that as many 28 percent of commercial driver's license (CDL) holders have sleep apnea.[1]

Signs of sleep apnea include daytime sleepiness, falling asleep at inappropriate times, loud snoring, depression, irritability, loss of sex drive, morning headaches, frequent nighttime urination, lack of concentration, and memory impairment. For commercial drivers, these symptoms are dangerous and potentially deadly. Research indicates that untreated sleep apnea puts drivers at increased risk for motor vehicle crashes. In fact, one study found that drivers with untreated sleep apnea did worse on performance tests than healthy alert subjects whose blood alcohol concentrations was above the federal limit for driving a commercial motor vehicle (CMV).[2]

*The good news is that sleep apnea is a highly treatable disorder.* A continuous positive airway pressure machine is the most effective therapy, requiring patients to wear a nasal mask during sleep. The mask, connected to a pump, gently forces compressed air into the nasal passages at pressures high enough to open the airway from the inside. In addition, people with sleep apnea can loose weight, avoid alcohol prior to bedtime, and avoid sleeping on their backs. Other treatments include the wearing of oral devices and surgery to remove enlarged tonsils, adenoids, nasal polyps, or other growths. Deviated nasal septums or unusually formed jaws or soft palates can also be corrected surgically.

**Related Links**

PDF Version

**Are You At Risk for Sleep Apnea?**

Sleep apnea occurs in all age groups and both sexes, but there are certain factors that put you at higher risk:

- A family history of sleep apnea
- Being overweight
- A large neck size (17 inches or greater for men, 16 inches or greater for women)
- Being age 40 or older
- Having a small upper airway
- Having a recessed chin, small jaw or a large overbite
- Smoking and alcohol use
- Ethnicity

Once you have received treatment for sleep apnea and comply with your treatment plan, you can do your job as safely as someone who doesn't have the disorder.

**What should a CMV driver do after learning that they have sleep apnea?**
Each state sets its own medical standards for driving a commercial motor vehicle in **intrastate commerce**. Many States have adopted the medical regulations found under Section 391.41(b)(5) of the FMCSRs and have determined that sleep apnea is a disqualifying condition. Each State has the jurisdictional authority to suspend a CDL if a person has sleep apnea. Medical examiners and CMV drivers should check with their Department of Motor Vehicles for more information about medical standards in their State.

**What level of sleep apnea (mild, moderate, severe) disqualifies a CMV driver?**
The disqualifying level of sleep apnea is moderate to severe, which interferes with safe driving. The medical examiner must qualify and determine a driver's medical fitness for duty.

**What are the obligations of a motor carrier concerning an employee with sleep apnea?**

A motor carrier may not require or permit a driver to operate a CMV if the driver has a condition, including sleep apnea, that would affect his or her ability to safely operate the vehicle.

If you suspect that you have sleep apnea, the FMCSA and the National Sleep Foundation (NSF) urge commercial truck and motorcoach drivers to discuss the problem with their doctor.

References:

1. Pack AI, Dinges DF, & Maislin G. (2002) A Study of Prevalence of Sleep Apnea among Commercial Truck Drivers (Report No. DOT-RT-02-030). Washington, DC: U.S. Department of Transportation, FMCSA.
2. Powell NB et al. (1999). A comparative model: reaction time performance in sleep-disordered breathing versus alcohol-impaired controls. Laryngoscope, 109(10):1648-54.

**DISCLAIMER**

The materials contained on this page were developed under a contract with the National Sleep Foundation (NSF) and are being disseminated by the Federal Motor Carrier Safety Administration (FMCSA) in the interest of information exchange. The FMCSA assumes no liability of the contents or use thereof.

The materials contained on this page do not establish FMCSA policies or regulations, nor do they imply an endorsement or partiality by FMCSA of any product, the NSF, or the conclusions and/or recommendations contained in the materials. Trademarks or manufacturers' names may appear herein only because they are considered essential to the object of the materials

# Sleep Study Report

## Patient Information

| | | | |
|---|---|---|---|
| First Name. | Joe | Last Name. | Gaggos | ID | 2000281388 |
| Birth Date. | Jul 5, 1956 | Age | 63 | Gender | Male |
| Insurer | Aetna | BMI | 32.4 (W=231 lb, H=5' 11") | | |
| Neck Circ . | | Epworth | | Mobile Phone | 713 594-3444 |
| Address | 1590 Hintz Rd  Sealy, Texas, USA 77474 | | | | |

## Sleep Study Information

| | | | |
|---|---|---|---|
| Study Date | Nov 15, 2019 | S#H/A Version | 5 . 76 4 / 3 3226 0 / 76 |

## Referring Physician Information

| | | | |
|---|---|---|---|
| First Name | Stanley | Last Name | Wang |
| Work Phone | | Mobile Phone | | Fax |
| E-mail | | | |

## Summary & Diagnosis

1. Findings are not consistent with clinically significant obstructive sleep apnea - AHI 2 8
2. No clinically significant nocturnal oxygen desaturation - SpO2 min 90%

## Recommendations

Therapy for sleep apnea is not indicated based on this study

| | | |
|---|---|---|
| Report prepared by: | Stanley Wang MD JD MPH | Electronically Signed: | Nov 20. 2019 |
| | | Signature: | |



December 22, 2021

**VIA Email & Uploaded to Portal: gerard.ladera@eeoc.gov**
EEOC Houston District Office
ATTN: Gerard Ladera, Investigator
Mickey Leland Building
Houston, TX 77002

RE: **Joe R. Gaggos Jr. v. Wal-Mart Stores East, LP**
       **EEOC Charge No. 493-2021-00381C**

Investigator Ladera:

Please allow the following to serve as Mr. Gaggos' rebuttal to Wal-Mart Stores East, LP ("Walmart" or "Respondent") position statement dated August 4, 2021.

**I. Factual Allegations**

Walmart subjected Mr. Gaggos to disparate and discriminatory treatment based on a perceived disability. In April of 2018, Walmart informed Mr. Gaggos that to maintain his employment he was required to utilize a CPAP machine which is a machine used to help a person who has obstructive sleep apnea breathe more easily during sleep. Walmart had required Mr. Gaggos to participate in a sleep study with a company called SleepSafe Drivers. Walmart contracts with SleepSafe Drivers to manage its sleep apnea program which includes arranging for sleep studies and providing and monitoring CPAP machines. It is important to note, that SleepSafe Drivers benefits from diagnosing employees with sleep apnea as they are then paid to perform the CPAP monitoring services for those individuals. Mr. Gaggos asserts that while he had several risk factors associated with sleep apnea, he was wrongly diagnosed by SleepSafe with the condition. Because Walmart informed Mr. Gaggos he would not be permitted to continue his employment if he did not use the CPAP machine, he did as instructed. Due to being forced to use a machine he did not need, Mr. Gaggos suffered several severe and irreversible side effects including the loss of ten percent of his vision in his right eye. Mr. Gaggos reported his concerns regarding the injuries he suffered and the fact that he was being required to use the CPAP machine despite it not being medically necessary to Mike Hansley (Safety Manager) and to SleepSafe Drivers; however, no action was taken.

In July and November of 2018 Mr. Gaggos underwent surgeries in order to correct his breathing issues. The surgeries were successful, and an additional benefit was that he lost weight and no longer had to take medication for high blood pressure which were two of his sleep apnea risk factors. On May 6, 2019, Mr. Gaggos underwent his DOT physical, and he was cleared to drive and was not required to utilize a CPAP machine. Walmart however refused to accept the DOT examination results and again required Mr. Gaggos to undergo a sleep study test with SleepSafe Drivers. When Mr. Gaggos took the sleep study test on Mary 31, 2019, it indicated that



he did not have sleep apnea, but there were concerns about hypopnea. Mr. Gaggos participated in another sleep study on June 30, 2019, and used a BiPAP machine instead of a CPAP. It was determined during this study that the shallow breathing that was registered was due to Mr. Gaggos breathing through his mouth. When Mr. Gaggos retook the sleep study it was confirmed that he does not suffer from any sleep disorders.

Despite having AHI levels in the normal range, Walmart informed Mr. Gaggos that the company was still going to require him to wear the CPAP. As Mr. Gaggos wanted to return to work, he agreed to wear the machine. However, Mr. Gaggos began to suffer from anxiety and PTSD due to the machine as he feared for his health based on the issues he experienced when using it previously. Mr. Gaggos provided Walmart with documentation from his physician confirming he did not need to use the CPAP and that he had an intolerance for the machine, but Walmart refused to budge. As a result of the anxiety caused by having to utilize a medical device he did not need, Mr. Gaggos was forced to take a medical leave of absence in October of 2019.

Mr. Gaggos' personal physician had him submit to additional testing on November 15, 2019, that again indicated he did not require a CPAP machine. Exhibit 1. However, Walmart refused to accept this second opinion despite Dr. Stanley Wang's credentials as an American Board of Internal Medicine certified sleep medicine specialist. In fact, Walmart refused to engage in the interactive process with Mr. Gaggos or take any steps to try and address the differing medical opinions it had received regarding Mr. Gaggos' condition. Because Walmart refused to engage in the interactive process with Mr. Gaggos he was forced to remain out on a leave of absence. While Walmart asserts Mr. Gaggos was terminated as he did not make a request to extend his leave, Mr. Gaggos denies this claim. On May 14, 2020, Mr. Gaggos had two separate calls with Sedgwick (third party provider Walmart contracts with to handle leave administration), and he spoke with his direct supervisor, Paul Peterson. Both Sedwick and Mr. Peterson confirmed with Mr. Gaggos that his leave had been extended through May 25, 2020. However, Walmart terminated his employment under pretext on May 15, 2020. Walmart's actions are in direct violation of Title I of the Americans with Disabilities Act of 1990.

## II. Legal Analysis

### A. Disability Discrimination

The ADA prohibits employers from discriminating "against a qualified individual on the basis of [a] disability in regard to … [the] discharge of employees, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Neely v. PSEG Texas, LTD. Partnership*, 735 F.3d 242 (5th Cir. 2012). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must prove that he: (1) has a disability; (2) was qualified for the job; and, (3) was subject to an adverse employment decision on account of his disability. *EEOC v. LHC Group, Inc.*, 773F.3d688, 2014 U.S. App. LEXIS 23295, 2014 WL 7003776 (5th Cir. Dec. 11, 2014), *citing, Zenor v. El Paso Cola Co.*, 176 F.3d 847, 853 (5th Cir. 1999).



Under the ADA, a person with a "disability" is defined to include an individual who is "regarded as having" an impairment. 42 U.S.C. § 12102(1)(C). In regarded as cases, a plaintiff must show that the employer knew that the employee had an actual impairment or perceived the employee to have an impairment, and that the impairment was not transitory or minor. *See Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016). It is clear from the evidence and claims presented by Walmart that the company regarded Mr. Gaggos as having a disability, sleep apnea. Mr. Gaggos was qualified for the position he held as he was cleared by not only his personal physician but had also been cleared to drive as part of his 2019 DOT annual physical exam. Finally, Mr. Gaggos suffered an adverse employment decision due to his disability when he was required to remain out on an unpaid leave of absence and when he was terminated. After the DOT cleared Mr. Gaggos in May of 2019 and his physician confirmed he did not suffer from sleep apnea in November of 2019, he suffered an adverse employment action when Walmart refused to allow him to return to work. Mr. Gaggos also suffered an adverse employment action when he was terminated on May 14, 2020. At the time of his termination, Walmart was aware that his leave was extended until May 25, 2020, but the company chose to terminate his employment under pretext. Walmart's actions are in clear violation of the law.

### B. Retaliation

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) that he engaged in activity protected by the ADA, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998). If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, U.S., 133 S.Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013); *Feist*, 730 F.3d at 454; *Sherrod*, 132 F.3d at 1122.

Mr. Gaggos engaged in protected activity when he requested to be exempt from utilizing the CPAP machine, and when he requested leave as a reasonable accommodation. Mr. Gaggos suffered an adverse employment action when he was terminated on May 15, 2020. A causal connection exists between Mr. Gaggos' protected activity and his terminated based on close temporal proximity. Temporal proximity can provide proof of causation if the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam). Mr. Gaggos spoke with Sedgwick and his direct supervisor on May 14, 2020, and he requested and was approved for an extension of his leave until May 25, 2020. However, a mere one day after his extension request Walmart terminated his employment in retaliation. While Walmart alleges Mr. Gaggos did not request an extension of his leave and that is why the company terminated him, this is clearly false. Walmart terminated Mr. Gaggos' employment in retaliation for his requests to return to work and/or be provided with the reasonable



accommodation of being exempt from utilizing the CPAP machine. Walmart's actions are in direct violation of Title I of the Americans with Disabilities Act of 1990.

### C. Interactive Process

The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "An employee who needs an accommodation . . . has the responsibility of informing [his] employer." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (alteration in original) (*quoting EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)). "[T]he employee 'must explain that the [proposed] adjustment in working conditions . . . is for a medical condition-related reason'" but is not required to use magic words like "reasonable accommodation." *Id.* (second alteration in original) (*quoting Chevron Phillips*, 570 F.3d at 621). Once an accommodation is requested, the employer must engage in an "interactive process" with the employee with "the goal of finding an appropriate accommodation for the limitation." *Id.* (*citing Chevron Phillips*, 570 F.3d at 621). "An employer that fails to engage in the interactive process in good faith violates the ADA." Id. (*citing Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)). To prevail on the claim of failure to engage in the interactive process, the employee must show that the employer's unwillingness to engage in the process led to a failure to reasonably accommodate the employee. *See Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (*citing Griffin* 661 F.3d at 224); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

In the instant case, Mr. Gaggos request at least two reasonable accommodations. Mr. Gaggos first requested to be exempted from using the CPAP machine, Mr. Gaggos then requested to be permitted to utilize a chin strap instead of the CPAP as the strap would correct any breathing issues. Walmart refused to engage in the interactive process with Mr. Gaggos and simply told him that he could either use the CPAP and return to work, or if he did not want to use it he could not return.

### III. Conclusion

Based on the foregoing it is evident that during his employment with Respondent Mr. Gaggos subjected to discrimination, denied reasonable accommodations, and retaliated against following his engagement in protected activity in violation of Title I of the Americans with Disabilities Act of 1990. Therefore, we respectfully request the EEOC enter a CAUSE finding.

Respectfully submitted,

Gabrielle Klepper
gabrielle.klepper@spielbergerlawgroup.com

cc: Joe R. Gaggos, Jr.

# EXHIBIT 1

*Sleep Study Report*

## Patient Information

| | | | | | |
|---|---|---|---|---|---|
| First Name. | Joe | Last Name. | Gaggos | ID | 2000261386 |
| Birth Date. | Jul 5, 1956 | Age | 63 | Gender | Male |
| Insurer | Aetna | BMI | 32 4 (W: 231 lb, H: 5' 11") | | |
| Neck Circ | | Epworth | | Mobile Phone | 713-594-3444 |
| Address | 1590 Hintz Rd  Sealy, Texas  USA 77474 | | | | |

## Sleep Study Information

| | | | |
|---|---|---|---|
| Study Date. | Nov 15, 2019 | S/H/A Version | 5 1 70 4 / 3 3226 0 / 70 |

## Referring Physician Information

| | | | |
|---|---|---|---|
| First Name | Stanley | Last Name | Wang |
| Work Phone | | Mobile Phone | Fax |
| E-mail | | | |

## Summary & Diagnosis

1. Findings are not consistent with clinically significant obstructive sleep apnea - AHI 2 8
2. No clinically significant nocturnal oxygen desaturation - SpO2 min 90%

## Recommendations

Therapy for sleep apnea is not indicated based on this study

Report prepared by:       Stanley Wang MD JD MPH          Electronically Signed:   Nov 20, 2019

Signature:

## Sleep Study Report

### Patient Information

| | | | |
|---|---|---|---|
| First Name: | **Joe** | Last Name: | Gaggos | ID: | **2000261386** |
| Birth Date: | Jul 5, 1956 | Age: | 63 | Gender: | Male |
| Insurer: | Aetna | BMI: | 32.4 (W=231 lb, H=5' ) | |
| Neck Circ.: | | Epworth: | | Mobile Phone: 713-594-3444 |
| Address: | 1590 Hintz Rd. Sealy, Texas, USA 77474 | | |

### Sleep Study Information

| | | | |
|---|---|---|---|
| Study Date: | **Nov 15, 2019** | S/H/A Version: | 5 : 76.4 / 3.3228.0 / 76 |

### Referring Physician Information

| | | | |
|---|---|---|---|
| First Name: | Stanley | Last Name: | Wang |
| Work Phone: | | Mobile Phone: | | Fax: |
| E-mail: | | | |

### Summary & Diagnosis

1. Findings are not consistent with clinically significant obstructive sleep apnea - AHI 2.8
2. No clinically significant nocturnal oxygen desaturation - SpO2 min 90%

### Recommendations

Therapy for sleep apnea is not indicated based on this study

| | | | |
|---|---|---|---|
| Report prepared by: | Stanley Wang MD JD MPH | Electronically Signed: | Nov 20, 2019 |
| | | Signature: | |

StDPhysicianServices  11/23/2019  3:53:58 PM   PAGE   2/004   Fax Server

**Austin Heart LaGrange**
2 SAINT MARKS PLACE STE 160
LAGRANGE TX 78945-1253
Phone: 979-242-5677
Fax: 979-242-5680

November 23, 2019

Bart Klaus, MD
109 Shult Dr
#101
Columbus TX 78934

Patient:     **Joe R Gaggos Jr**
MR Number: **2000261386**
Date of Birth: **07/05/1956**
Date of Visit: **11/8/2019**

Dear Dr. Klaus:

Thank you for allowing us to care for your patient, Joe Gaggos Jr. Please see my note below.

**Subjective:**
Mr. Gaggos Jr is a pleasant 63 y.o. man who sees Dr. Henderson for cardiovascular issues and is referred for evaluation of obstructive sleep apnea.

Despite not having sleep apnea symptoms (he denies snoring or somnolence), the patient says he underwent an initial sleep study due to work requirements (Wal-Mart / SleepSafe) and was diagnosed with sleep apnea. He was started on CPAP but could not tolerate therapy. He resorted to surgery (uvulopalatopharyngoplasty and mandibular advancement surgery November 2018).

He had a follow up diagnostic polysomnogram on 5/31/19 reportedly showing residual obstructive sleep apnea with an AHI of 14.0, followed by a BPAP titration study on 6/30/19 showed an optimal response to BPAP at 10/6 and 12/8 cm H2O.

Despite not having sleep apnea symptoms, he started on BPAP therapy and was compliant (his device download from 9/24/19-10/23/19 confirms use over 4 hours on 87% of nights with improvement in AHI to 7.3) but continues to have considerable difficulty tolerating therapy ("too much pressure") and feels he sleeps much more restfully without BPAP. He strongly wishes to discontinue therapy, but was told by his employer that he must continue using it.

We reviewed his sleep study reports and he points out inconsistencies in the report (including unrealistic heart rates of 15-384 BPM), making him skeptical of the findings. He remains asymptomatic, denying snoring or excessive daytime somnolence, and says he has taken further measures that may lower his AHI, including myofunctional therapy as well as weight loss of "100 pounds."

He requests to be reassessed and to discontinue BPAP if he can safely do so.

RE: Gaggos Jr, Joe -- MR#: 2000261386                                    Page 1 of 3

JPhysicianServices 11/23/2019 3:53:58 PM   PAGE   3/004   Fax Server

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • FLUoxetine (PROZAC) 20 MG capsule | Take 20 mg by mouth daily | | |
| • levothyroxine (SYNTHROID, LEVOTHROID) 100 MCG tablet | Take 100 mcg by mouth daily | | |
| • testosterone cypionate (DEPOTESTOTERONE CYPIONATE) 100 mg/mL injection | Inject 10 mg into the muscle every 14 (fourteen) days | | |
| • furosemide (LASIX) 20 MG tablet | Take 20 mg by mouth Daily as needed | | |
| • hydrOXYzine (VISTARIL) 25 MG capsule | Take 25 mg by mouth Daily as needed | | |

No current facility-administered medications for this visit.

**Vitals:**

| | 11/08/19 0855 |
|---|---|
| Height: | 1.803 m (5' 11") |
| Weight: | 105.1 kg (231 lb 12.8 oz) |
| BMI (Calculated): | 32.3 |
| Pulse: | 62 |
| BP: | 132/88 |
| BP Location: | Arm lower left |
| Patient Position: | Sitting |

**ECG Result:**
No ECG was performed for this visit.

**Assessment and Plan:**
**Problem List Items Addressed This Visit**

Obstructive sleep apnea - Primary
He has a prior diagnosis of persistently elevated AHI despite major ENT surgeries.
He is intolerant of CPAP and BPAP.
He denies sleep apnea symptoms and has taken additional measures to lower his AHI including weight loss and myofunctional therapy.
Per AASM guidelines, therapy for sleep apnea is not indicated if AHI is <15 and patient does not have symptoms.
•   reassess with polysomnogram
•   if AHI <15, then therapy for sleep apnea would not be indicated and he should discontinue BPAP unless symptoms arise

RE: Gaggos Jr, Joe -- MR#: 2000261386                                Page 2 of 3

PhysicianServices 11/23/2019 3:53:58 PM   PAGE   4/004   Fax Server

Return for follow up if needed for abnormal test results.

If you have questions, please do not hesitate to call me.

Sincerely,


STANLEY WANG, MD


CC
No Recipients

RE: Gaggos Jr, Joe -- MR#: 2000261386                Page 3 of 3



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Houston District Office**

Mickey Leland Building
1919 Smith Street, 7th Floor
Houston, TX 77002
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Houston Direct Dial: (346) 327-7748
FAX (713) 651-4902
Website: www.eeoc.gov

August 6, 2021

Joe R. Gaggos, Jr.
1590 Hintz Rd
Sealy, TX 77474

RE: EEOC Charge: 493-2021-00381C
    Joe R. Gaggos, Jr. v. WALMART

Dear Mr. Gaggos:

This letter is to inform you that EEOC received Respondent's response and we have enclosed (attached) a copy of that Position Statement for your review and response. Please provide your response in writing and provide any additional information you may have in support of your charge. If we do not hear from you within 20 days from the date of this letter, we will decide the case based on the evidence currently in your file.

**NOTICE OF NON-DISCLOSURE ON THE POSITION STATEMENT:**

**The attached enclosed documents are provided. By accepting these documents you agree that you will use them only in connection with contemplated litigation and will only show them to persons in a privileged relationship, such as a spouse, clergy, or medical, financial or legal advisor.**

In the event that the evidence does not support the issuance of a violation, we will dismiss the case and issue a notice of right to sue. Should this occur, you will have ninety (90) days from the day you receive the Dismissal Notice to file a lawsuit in court. If you need further information, please call me at (346) 327-7726.

Sincerely,

Christina Hernandez

Office Automation Assistant

cc: Ms. Gabrielle Klepper, Esq.
    SPIELBERGER LAW GROUP
    4890 W. Kennedy Blvd.
    Suite 950
    Tampa, FL 33609



Employment & Labor Law Solutions Worldwide

<div align="right">

**Littler CaseSmart®**
**Program Mailing Address:**

Littler Mendelson, P.C.
Global Services Center
2301 McGee Street
Suite 800
Kansas City, MO 64108

</div>

August 4, 2021

**VIA EEOC PORTAL**

Christina Hernandez, Investigator
U.S. Equal Employment Opportunity Commission
Houston District Office
1919 Smith Street
7th Floor
Houston, Texas 77002

      **Re:   Joe R. Gaggos, Jr. vs. Wal-Mart Stores East, LP**
              **Charge No.:  493-2021-00381**

Dear Ms. Hernandez:

      This letter and the attached documentation constitute Wal-Mart Stores East, LP's ("Walmart") initial Statement of Position in response to the Charge of Discrimination filed by former Truck Driver Joe Gaggos.[1,2] In his Charge, Mr. Gaggos alleges Walmart unlawfully discriminated against him based on his age (64) and his disability (unidentified) when it

---

[1] The information and accompanying documentation contained herein, and that which may be submitted hereafter, is strictly confidential and not to be used for any purpose other than the resolution of the current Charge and it may not be disclosed publicly. *See* 42 U.S.C. §§ 2000e-5(b); 2000e-8(e); 29 C.F.R. §§ 1601.22, 1601.26; and 56 Fed. Reg. 10847. To the extent Mr. Gaggos is in receipt of this information or accompanying documentation, she is advised that this information is strictly confidential and should not be disclosed publicly or to any individual unless they have a privileged relationship with that individual. Information and accompanying documentation contained herein designated confidential and/or containing sensitive medical information, confidential commercial or financial information, or trade secret information may not be disclosed to Charging Party.

[2] This response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the Commission in its investigation and facilitating the informal resolution of these matters. This response, while believed to be accurate, does not constitute an affidavit or binding statement of Walmart's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Charging Party's allegations. Because additional facts likely would be uncovered through discovery or following a full investigation, Walmart in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, Walmart does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Charging Party's allegations. Walmart requests that any efforts to contact its current or former managers be directed through its counsel.

Christina Hernandez, Investigator
August 4, 2021
Page 2

terminated his employment on May 15, 2020. Walmart denies Mr. Gaggos' allegations. Walmart did not subject Mr. Gaggos to unlawful discrimination. Mr. Gaggos was terminated only because he failed to take any action once his leave of absence ended. Mr. Gaggos had the option to request an extension on his leave of absence, but he failed to do so. Accordingly, Walmart respectfully requests his Charge be dismissed with a no-cause finding.

**I.      FACTUAL BACKGROUND**

  A.      <u>Walmart's Relevant Policies</u>

   Walmart is an equal opportunity employer and it does not discriminate against or tolerate discrimination or unlawful harassment against its Associates on any legally recognized basis, including age or disability. **Exhibit 1.** To that end, Walmart adheres to a Discrimination and Harassment Prevention Policy. **Exhibit 2.** This Policy strictly prohibits discrimination or harassment by or directed at any Associate, job applicant, customer, member, supplier, or agent of Walmart. *Id.* The Policy also instructs Associates to report any conduct that may violate this Policy to a salaried member of Management, or to utilize an Ethics Helpline. *Id.* Indeed, Associates are trained to immediately report any concern regarding possible violations of this Policy to any salaried member of Management or confidentially and/or anonymously to the Global Ethics Office, 1-800-WMETHIC (1-800-963-8442), and all such reports will be promptly investigated. *Id.* Retaliation is similarly prohibited. *Id.*

   Walmart also complies with all relevant and applicable provisions of the Americans with Disabilities Act ("ADA") and does not discriminate against any Associate on the basis of a qualifying disability, a perceived qualifying disability, a record of having a qualifying disability, or a known close relationship with an individual who has a qualifying disability. **Exhibit 3**. Walmart also does not discriminate against any qualified Associate with respect to any terms, privileges or conditions of employment because of the person's physical or mental qualifying disability. *Id.* The Accommodation in Employment Policy articulates Walmart's commitment to accommodating disabled Associates and providing them the opportunity to find fulfilling careers at Walmart. *Id.* This Policy also sets out the simple steps an Associate must take to request a reasonable accommodation for an alleged disability. *Id.*

   Additionally, in accordance with federal law, Walmart has a Family and Medical Leave Act ("FMLA") Leave of Absence Policy for Associates who need time away from work for their own serious medical condition, birth or adoption of a child, serious health condition of a child, spouse or partner, pregnancy/childbirth, or for military family care and exigency. **Exhibit 4**. Under this Policy, an Associate submits leave requests to Walmart's third-party leave administrator, Sedgwick Claims Management Services, Inc. ("Sedgwick"). Sedgwick is the entity to which Associates submit their medical certifications and that grants or denies an Associate's leave request. Walmart Associates seeking a leave of absence communicate directly with Sedgwick for all issues relating to the leave, including but not limited to the approval process, documentation required, and extensions.

Christina Hernandez, Investigator
August 4, 2021
Page 3

Walmart also complies with all rules and regulations related to Truck Drivers. Specifically, the Department of Transportation's (DOT) regulations require truck drivers to undergo an annual DOT medical examination to be certified as physically qualified. Federal regulations provide in relevant part: a person is physically qualified to drive a commercial motor vehicle (CMV) if that person "has no established medical history or clinical diagnosis of a *respiratory dysfunction* likely to interfere with his/her ability to control and drive a CMV safely." 49 CFR § 391.41 (b).

In addition, the Federal Motor Carrier Safety Administration (FMCSA) does not have requirements in place that mandate a Truck Driver to complete a sleep apnea test during a DOT physical; however, the FMCSA has a regulation called the Pulmonary Standard which grants the medical examiner the discretion to determine whether testing for a *respiratory disorder* like sleep apnea is necessary for a driver to be medically certified to operate a CMV.

Upon hire and throughout his employment, Walmart provided training, information, and documentation to Mr. Gaggos regarding its policies, including but not limited to those referenced above.[3] **Exhibit 5.** As set forth below, Walmart followed its policies and did not unlawfully discriminate against Mr. Gaggos.

B.      Mr. Gaggos' Employment at Walmart

On January 31, 2000, Walmart hired Joe Gaggos as a Truck Driver at Transportation Office #6821 in Porterville, California. In September 2005, Mr. Gaggos transferred to Transportation Office #7836 in Sealy, Texas and has been there since.

Per the federal regulations mentioned above, Mr. Gaggos had an annual DOT medical examination in April 2018. During this examination, a medical examiner determined that Mr. Gaggos was at risk for sleep apnea. Mr. Gaggos was accordingly referred to SleepSafe Drivers, which manages Walmart's sleep apnea program for its truck drivers.

Soon thereafter, Mr. Gaggos underwent a sleep study and was diagnosed with sleep apnea. He was recommended a CPAP machine. In order to continue working as a Truck Driver, Mr. Gaggos was required to use the CPAP machine at least four hours a night, 70 percent of the time. But, because Mr. Gaggos failed to comply with this requirement, he was placed on a leave of absence through Sedgwick beginning May 31, 2018. Per federal regulation, Mr. Gaggos could not return to work unless he was compliant. While on leave, Mr. Gaggos underwent two surgeries related to sleep apnea; therefore, his leave was ultimately extended till April 2019.

---

[3] Associates learn the rules and procedures related to their employment through a formal orientation period, on-the-job training, and Computer-Based Learning modules ("CBLs"). Associates are advised of changes in rules and procedures through Associate meetings, CBLs, and through access to Walmart's intranet service known as "OneWalmart."

Christina Hernandez, Investigator
August 4, 2021
Page 4

Before Mr. Gaggos could return to work in April 2019, he was given an annual DOT medical examination and was again re-tested for sleep apnea. Mr. Gaggos claims in his Charge that Walmart did not know what to do with him, but Walmart denies this allegation. When Mr. Gaggos was re-tested for sleep apnea, he was again diagnosed with sleep apnea and recommended a CPAP machine. **Exhibit 6.** Mr. Gaggos complied with the CPAP machine requirements from July 2019 to October 2019, so he returned to his regular duties as a Truck Driver during that time period.

Merely four months later, in October 2019, Mr. Gaggos requested and was approved another leave of absence. **Exhibit 7.** Mr. Gaggos' doctor noted that he suffered from anxiety and should not drive more than one hour at a time. **Exhibit 8.** Mr. Gaggos requested an extension on this leave till May 2020.

Mr. Gaggos had previously requested extensions on his leave of absences; however, when his most recent leave exhausted on May 14, 2020, he failed to take any action despite having notice that his leave was ending and that he had the option to request an extension on his leave. **Exhibit 9.** As a result of Mr. Gaggos' inaction, his employment was terminated on May 15, 2020. **Exhibit 10.**

## II. WALMART DID NOT UNLAWFULLY DISCRIMINATE AGAINST MR. GAGGOS

Contrary to the allegations in his Charge, Walmart did not unlawfully discriminate against Mr. Gaggos based on his age or disability.

Mr. Gaggos' claims that Walmart discriminated against him based on his age and disability when it terminated his employment are meritless. As explained above, Mr. Gaggos' employment was terminated for the simple reason that he failed to return when his approved leave of absence expired or request an extension on his leave of absence. Mr. Gaggos was given the option of extending his leave, but he failed to do so. *See* **Exhibit 9.** In fact, Mr. Gaggos was informed by Ms. Robin that if he did not apply for a leave extension, he would be terminated in the system. He clearly knew how to apply to extend his leave, given that he had done so in the past.  Mr. Gaggos took no action at the time and now inaccurately alleges that Walmart terminated him due to his age or disability. Walmart followed federal regulations and its policies throughout Mr. Gaggos' employment. At no point did Walmart unlawfully discriminate against Mr. Gaggos due to any protected category. In these circumstances, no unlawful discrimination occurred or can be inferred. As a result, Mr. Gaggos' claims fail.

## III. CONCLUSION

Based on the foregoing, Walmart respectfully requests the Commission dismiss Mr. Gaggos' Charge in its entirety with a no-cause finding. As always, if you have any questions, please do not hesitate to contact me.

Christina Hernandez, Investigator
August 4, 2021
Page 5


Sincerely,

LITTLER MENDELSON, P.C.


/s/Sanaa Khan

Sanaa Khan
816.788.7044 direct
816.708.8628 mobile
skhan@littler.com

SK/BT

# EXHIBIT 1

# Global Statement

## of Ethics



Walmart/Gaggos Statement of Position

000002

# Using the Statement of Ethics

Our Statement of Ethics will introduce you to the behaviors and conduct that create an honest, fair and objective workplace while operating in compliance with all laws and our policies. It will help you recognize situations that might come up on your job which could be a violation of our company ethics. You'll also learn what to do if you have questions about what is considered ethical conduct.

## How the Statement of Ethics is Organized

- Inside the front cover, Doug McMillon, our President and CEO, points out how important it is for all of us to follow our Statement of Ethics and to report anything we feel might be a violation of those ethics.

- The next page features Our Beliefs. These are Walmart's fundamental beliefs for all conduct, including acting with integrity.

- The Introduction section explains it's everyone's responsibility to comply with our Statement of Ethics and to report what you feel might be a violation of policy or law.

- The section Raising Concerns & Speaking Up tells you how to request an opinion before you take action and how to report what you think might be a violation of ethics, including how to make a report in private without giving your name.

- This guide gives you an overview of many, but not all, Walmart policies. Some commonly asked questions are included to help explain the policies better. There also are examples of how this Statement of Ethics and other Walmart policies apply in all countries.

## Walmart Policies & Local Laws

Walmart publishes several global policies, which are designed to give associates guidance that is the same for all locations. This Statement of Ethics is an example of a global policy. In addition, each business unit Walmart operates is expected to have a complete set of policies providing guidance to associates for the country in which they are working. Because these policies may vary by business unit or market, they are not linked to this Statement of Ethics. It's our responsibility to know all of the policies that might apply to our areas of the business. If you're not sure about the policies in your area, please talk to your manager, the Legal Department or Global Ethics.

Walmart conducts business in many countries around the world. Our associates are citizens of many countries. As a result, our operations are subject to many different laws, customs and cultures. Our operations must comply with all applicable local laws and regulations in addition to this Statement of Ethics. In some instances, the laws of two or more countries may conflict, or a local law may conflict with the Statement of Ethics. When you encounter a conflict, contact Global Ethics for guidance on how to apply the Statement of Ethics in your country.



### Contact Us

anonymous and confidential

walmartethics.com
1-800-WM-ETHIC • 1-800-963-8442

Specific phone numbers for all countries are listed at the back of this document.

To ask a question or report a violation, contact Walmart Global Ethics at **www.walmartethics.com** or call **1-800-WM-ETHIC** in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

# Our Beliefs



Since Sam Walton founded our company it always has been a values-based, ethically led organization. Our beliefs are the values that guide our decisions and our leadership.

## Respect for the Individual
We value every associate, own the work we do, and communicate by listening and sharing ideas.

## Service to our Customers
We're here to serve customers, support each other, and give to our local communities.

## Striving for Excellence
We work as a team and model positive examples while we innovate and improve every day.

## Act with Integrity
We act with the highest level of integrity by being honest, fair and objective, while operating in compliance with all laws and our policies.

## Vision Statement
The vision of Global Ethics is to promote ownership of Walmart's ethical culture to all stakeholders globally.

## Are you making the right decisions?

When faced with making any decision, you should ask yourself the following questions:

- Is it consistent with Our Beliefs?
- Would I want others to know about it?

If the answer to either question is no consider whether your potential action complies with our Statement of Ethics. If it does not, identify a better plan of action. If you are unsure about a decision, talk to your manager or contact Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

000004   4
Walmart/Gaggos Statement of Position

# Introduction

> 66 **Personal and moral integrity is one of our basic fundamentals and it has to start with each of us.** 99
>
> Sam Walton,
> Founder

## ⬤ Who is Covered by the Statement of Ethics?

### Associates and Directors

Our Statement of Ethics applies to all associates at all levels of the organization worldwide and all members of the board of directors of Wal-Mart Stores, Inc. It also applies to all associates and directors of Walmart-controlled subsidiaries.

### Third Parties

Walmart expects all suppliers, consultants, law firms, public relations firms, contractors and other service providers to act ethically and in a manner consistent with this Statement of Ethics. If you hire a third party, you should take reasonable steps to ensure the third party is aware of this Statement of Ethics, has a reputation for integrity and acts in a responsible manner consistent with our standards.

## ⬤ Associate Responsibilities

Every Walmart associate has responsibility to:

- Follow the law at all times. If you see any associate violating the law, or if you're asked to do something you believe may violate the law, discuss it immediately with your manager or Global Ethics.

- Read and understand Our Beliefs and use them in your job every day.

- Learn the policies that apply to your job. No one expects you to memorize every policy, but it's good to have a basic understanding of the issues covered by each policy.

- Ask for help from your manager, Global Ethics or other Walmart resources when you have questions about the application of this Statement of Ethics or other policies.

- Immediately raise any concern you or others may have about possible requests or acts that may be a violation of this Statement of Ethics or a Walmart policy.

- Raise any ethics concerns with a manager or by contacting Global Ethics. If you raise an ethics concern through a manager and the issue is not resolved, raise it through a different manager or contact Global Ethics. The various ways to raise concerns are described in more detail later in this guide.

- Cooperate with Walmart's investigations and report all information truthfully.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

Walmart/Gaggos Statement of Position



## ⬤ Additional Responsibilities for Management

All management associates are responsible for creating an environment that encourages compliance with our Statement of Ethics. Supervision of responsible business practices is as important as supervision of performance. To help us maintain the highest ethics, you should:

- Contact Global Ethics if you are made aware of an ethics issue covered by the Immediately Reportable Criteria on page 9 or for assistance handling an ethics question or concern.

- Meet with your direct reports periodically to review Our Beliefs and our Statement of Ethics.

- If there is a conflict between our ethics and business objectives, ensure our ethics always come first.

- Lead by example and encourage your associates to act with integrity in all dealings to avoid even the appearance of a violation of our ethical standards.

- If an ethics issue arises with one of your associates, make sure other associates in your area are not making the same mistake.

- Ensure open communication by encouraging associates in your department or division to ask questions concerning our Statement of Ethics.

- Never cover up or ignore any ethical conduct problem. Address the matter timely and seek guidance if necessary.

- Appreciate associates who raise issues.

- Never retaliate against anyone for raising an ethics issue, assisting in an investigation or participating in any proceeding relating to an alleged violation of any government regulation, law or rule or alleged fraud against shareholders.

- Once an ethical concern is raised, do not interfere with any investigation into the matter.

- Encourage self-reporting of business conduct violations. If an associate voluntarily reports he or she was involved in an ethics violation, self-reporting may be considered when determining the appropriate disciplinary action to be taken.

## ⬤ Discipline for Violations

Appropriate disciplinary action, up to and including termination, may be taken against any associate who violates our Statement of Ethics, or applicable laws, regulations or policies.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

00006   6
Walmart/Gaggos Statement of Position

# Raising Concerns & Speaking Up

> **66 Don't compromise your reputation. It's a precious commodity. Don't compromise your integrity... have a good name. 99**
>
> Sam Walton,
> Founder

All of us should constantly strive to maintain a work environment that encourages associates to raise concerns about possible violations of our Statement of Ethics. Often we hear stories of other companies where employees were aware of problems, but did not feel comfortable coming forward. No one should ever feel that way at Walmart. Please report possible ethics issues immediately so they can be resolved before more serious consequences develop. Walmart prohibits retaliation against any associate who raises a concern.

## ⚫ Ethics Opinions

In the normal course of business, you might have a situation in which you're not sure if your conduct violates the Statement of Ethics or not. When you have an ethics question, you are encouraged to contact Global Ethics for a verbal or written opinion before you take action.



Opinion requests may be submitted to Global Ethics under the "Ask a Question" option at **www.walmartethics.com.**

## ⚫ What Happens When an Ethics Concern is Raised?

Walmart takes all reported concerns seriously. We confidentially investigate ethics allegations to determine if any law, policy or the Statement of Ethics has been violated. Walmart has a compelling interest in protecting the integrity of every investigation, including protecting reporters and witnesses from harassment, intimidation and retaliation; keeping evidence from being destroyed; ensuring testimony is honest and identifying and addressing root causes. If you report a violation, Global Ethics will make every effort to keep your identity private and to secure any data relating to the investigation. Also, Global Ethics may reasonably impose a requirement that witnesses must maintain a particular investigation and their role in it in strict confidence. In such cases, you must maintain confidentiality and not discuss your report or the investigative process with others. Global Ethics does not generally disclose investigation details, but you will be informed of the status of the investigation.

To ask a question or report a violation, contact Walmart Global Ethics at **www.walmartethics.com** or call **1-800-WM-ETHIC** in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

900007    7

Walmart/Gaggos Statement of Position

## ⬤ Non-Retaliation

Associates who come forward with concerns play an important role in maintaining a healthy, respectful and productive workplace, as well as protecting our stakeholders. These associates help our company address problems early — before more serious consequences develop. It's important for each of us to create a work environment where everyone can raise concerns of ethics issues without fear of retaliation.

Retaliation against associates who raise concerns or questions about misconduct will not be tolerated. Concerns should be raised in good faith, which means you have made a genuine attempt to provide honest and accurate information, even if you are later proven to have been mistaken. Walmart reserves the right to discipline anyone who knowingly makes a false accusation or has acted improperly. However, if an associate voluntarily reports they were involved in a violation, self-reporting may be considered when determining the appropriate disciplinary action to be taken.

Walmart will not terminate, demote or otherwise discriminate against associates for raising concerns. Also, it is important for co-workers not to isolate associates who have raised concerns — such associates should be treated with respect. Any change in treatment toward an associate who has raised a concern could be seen as a form of retaliation.

Walmart has an established process to deal with retaliation issues. Associates who believe they have experienced retaliation after raising an ethics concern should report the issue to their manager or Global Ethics.

## ⬤ How to Raise a Concern

Walmart provides a variety of resources for you to raise a question or concern. Depending on the nature of the concern, it may be easiest to talk directly to the person responsible about your concern, providing the person with an opportunity to clarify the issue. If you don't feel comfortable talking to the person responsible, you should consult one of the resources listed below. Self-reporting is encouraged and may be taken into consideration in determining appropriate disciplinary action.

## Use the Open Door Communications process

The Open Door Communications process is the most direct way to voice any concern to a manager. If you believe your immediate manager is involved in the problem, discuss the issue with the next level of management who is not involved, use the Open Door Helpline (1-800-530-9929) or use one of the other resources described below.

### Contact Global Ethics

Walmart has a Global Ethics Helpline, which is available to associates around the world 24 hours a day, seven days a week, and is equipped to handle most local languages. The helpline is staffed by an organization not affiliated with Walmart, and to the extent possible (and in conformity with local regulations), callers may remain anonymous. In all cases, associate privacy will be respected to the fullest extent possible under the law. The operator will relay the information to Global Ethics and will provide the associate with a case number and callback date if desired. Contact information for Global Ethics is provided below. The Immediately Reportable Criteria outlined on page 9 must be reported through these channels. Country-specific contact information is listed at the back of this document.

### Global Ethics Contact Information

**📞 Phone**

U.S.A., Puerto Rico and Canada:
1-800-WM-ETHIC
[1-800-963-8442]

Specific phone numbers for all countries are listed at the back of this document.

**✉ Mail**

Wal-Mart Stores, Inc.
Attn: Global Ethics
702 SW 8th Street
Bentonville, AR
72716-0860

**🖥 Internet**

walmartethics.com

To ask a question or report a violation, contact Walmart Global Ethics at **www.walmartethics.com or call 1-800-WM-ETHIC** in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

Walmart/Gaggos Statement of Position                    8

# ⬤ Immediately Reportable Criteria

Associates may raise concerns regarding conduct that may violate the Global Statement of Ethics through the various channels listed in the Raising Concerns & Speaking Up section. However, there are certain types of allegations that must immediately be reported to Global Ethics. They are:

## Bribery

- Providing, offering, promising, requesting, or receiving any improper or unearned benefit
- Any violation of the company's Global Anti-Corruption Policy or related procedures
- All suspected violations of anti-bribery laws should also be reported, including any violations of the anti-bribery restrictions in the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K. Bribery Act.

## Officer Misconduct

- Violations of the Global Statement of Ethics by company officers or direct reports to any company CEO

## Fraud or Theft Greater Than $100,000 and Involving an Associate

## Incorrect Records and Accounts

- Interfering with audits or internal controls, falsifying, misrepresenting, or destroying financial records, reports, or data, or improperly concealing, altering, or manipulating financial records, reports, or data

## Information System Hacking

- Any conduct involving an associate maliciously gaining unauthorized access to company information systems

## Global Corporate Brand Reputation Risks

- Threats to human life, slave or forced labor, human trafficking, or child labor
- Serious criminal misconduct, such as:
  - Bid rigging, price fixing, market or customer division or allocation, or other anti-competitive collusion
  - Insider trading
  - Trade sanctions and export regulation violations
  - Money laundering

# ⬤ Waivers

Any associate can request a waiver of the applicability of this Statement of Ethics. All requests must be submitted in writing to Global Ethics by the associate and must contain the relevant details and facts supporting the requested waiver. Global Ethics will respond in writing to the associate. Where required by law for certain executive officers or board of directors members, requests for waivers will be considered by the audit committee or the full board of directors and approval of such waivers will be promptly disclosed to shareholders.

All waiver requests must be approved in advance of the conduct for which approval is sought.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

9

Walmart/Gaggos Statement of Position



## Non-Retaliation

**Q** **I reported an allegation six months ago. Ever since, my manager has stopped including me in several meetings. Is this retaliation?**

**A** Significant changes in how you're treated may be retaliation. If your manager treats you differently after reporting an allegation, you should raise your concern to management through the Open Door process or by contacting Global Ethics.

**Q** **One of my associates called the Helpline and made a false claim against me. I think she did it to hurt my career. Can I give her a lower rating on her evaluation since she is obviously trying to spread lies about me?**

**A** We should believe associates who report concerns do so in good faith. Taking action against an associate because the associate reported a concern is retaliation and may result in disciplinary action for you as a manager. Retaliation will not be tolerated at Walmart. It prevents an open reporting environment and encourages a culture of fear.

**Q** **Is protection from retaliation only available if I report my concerns through the Helpline?**

**A** Retaliation is unacceptable no matter how you report your concern whether through management, Human Resources or Global Ethics. If you believe you have been retaliated against, report your concern to management through the Open Door process or contact Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at **www.walmartethics.com or call 1-800-WM-ETHIC** in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

Walmart/Gaggos Statement of Position   10

## Leading with Integrity in Our Workplace

**❝ You can overcome almost anything, but you cannot overcome a lack of integrity. ❞**

Lee Scott,
Former President and CEO,
Wal-Mart Stores, Inc.

## ⬤ Alcohol & Drug Free Workplace

Walmart is committed to a safe and healthy workplace for everyone. The possession, solicitation or use of illegal drugs, or being under the influence of such drugs while at work, is

### *Walmart strictly forbids improper use of drugs and alcohol.*

prohibited and will not be tolerated. Walmart strictly forbids improper use of drugs and alcohol. All associates should ensure their performance and judgment are unimpaired by alcohol consumption during work hours. Associates should not report to work under the influence of alcohol nor should they consume alcohol on company property. In some instances, associates of the legal drinking age may consume alcoholic beverages at company-sponsored events if the consumption of alcohol is approved in advance by the country president or the corporate executive vice president for the business unit sponsoring the event. Walmart will take customary practices into consideration in countries where a moderate consumption of alcohol with a business meal is common.

## ⬤ Discrimination & Harassment Prevention

One of the basic beliefs upon which Sam Walton founded our company is "respect for the individual." Each of us is responsible for creating a culture of trust and respect that promotes a positive work environment. This means treating one another with fairness and courtesy in all of our interactions in the workplace. We are committed to maintaining a diverse workforce and an inclusive work environment. Walmart prohibits discrimination in employment, employment-related decisions or in business dealings on the basis of an individual's race, color, ancestry, age, sex, sexual orientation, religion, disability, ethnicity, national origin, veteran status, marital status, pregnancy or any other status protected by law or local policy. We should provide an environment free of discrimination to our associates, customers, members and suppliers.

*We believe in a positive, respectful work environment for all associates.*



To ask a question or report a violation, contact Walmart Global Ethics at **www.walmartethics.com or call 1-800-WM-ETHIC** in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

Walmart/Gaggos Statement of Position

*Harassment in the workplace is prohibited regardless of whether it is welcome or unwelcome.*

We believe in treating each other with respect, whether it's a co-worker, supplier, customer or anyone doing business with us.

Harassment is conduct which inappropriately or unreasonably interferes with work performance, diminishes the dignity of any person or creates an intimidating, hostile or otherwise offensive work environment based on an individual's legally protected status. Verbal, visual, or physical conduct of a sexual nature is not acceptable in the workplace and may be determined to be sexual harassment. Examples include:

- Sexual advances, requests for sexual favors, sexually explicit language, off-color jokes, remarks about a person's body or sexual activities
- Displaying sexually suggestive pictures or objects, suggestive looks, leering or suggestive communication in any form
- Inappropriate touching, both welcome and unwelcome

We also prohibit other forms of harassment based on an individual's legally protected status, such as:

- Using slurs or negative stereotyping
- Verbal kidding, teasing or joking
- Intimidating acts, such as bullying or threatening
- Any other conduct that shows hostility toward, disrespect for or mistreatment of an individual based on the individual's legally protected status

Harassing conduct in the workplace, such as that described above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or different sex, sexual orientation, race or other status. Again, Walmart prohibits retaliation and will not terminate, demote or otherwise discriminate against associates for reporting concerns.

## ⬤ Inappropriate Conduct

We believe in maintaining a working environment free of inappropriate conduct such as obscene, profane, gross, violent, discriminatory, bullying or similarly offensive language, gestures or conduct. Walmart will not tolerate such conduct, which violates our belief of respect for the individual.

While posting information online can be a great way to connect with others, always conduct yourself online in a manner that is consistent with Walmart's ethics and Our Beliefs. Inappropriate conduct of the type described here is strictly prohibited, even if it occurs online.



## ⬤ Wage & Hour

We are committed to complying fully with all applicable laws and regulations dealing with wage and hour issues, including off-the-clock work, rest breaks, meal periods and days of rest, overtime pay, termination pay, minimum-wage requirements, wages and hours of minors and other subjects related to wage and hour practices. As Walmart associates, we must:

- Comply fully with all corporate policies and procedures related to wage and hour issues
- Comply fully with all applicable laws and regulations pertaining to wage and hour issues
- Report any violations of wage and hour laws or policies through the Open Door Communication process or by contacting Global Ethics

It is a violation of law and Walmart policy for you to work without compensation or for a supervisor (hourly or salaried) to request you work without compensation. You should never perform any work for Walmart without compensation.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

12
Walmart/Gaggos Statement of Position

# EXHIBIT 2

000013
Walmart/Gaggos Statement of Position

# Discrimination & Harassment Prevention Policy English

## State Specific

California

New York

Updated: April 3, 2020

We believe in fostering a workplace culture and customer experience where everyone is and feels included. We respect the dignity of every individual and value their unique skills. Having a workforce of associates from diverse backgrounds makes us a better company. Respectful and professional conduct furthers our mission, promotes productivity, minimizes disputes and enhances our reputation in the communities where we work.

All associates, customers, members, or other individuals with whom we have contact in the course of our business should be treated fairly and respectfully without regard to their personal appearance, beliefs, culture, affiliations, or any other characteristics, as long as their conduct does not interfere with the legitimate interests of Walmart or other individuals.

We are also committed to providing an environment that is free of discrimination or harassment based on an *individual's status*.

*Individual's status* means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, military status (including required military training obligations) or membership in the uniformed services, sexual orientation, gender identity or expression, genetic information or any other legally protected status. Individual's status also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described within this policy, by or directed at:

- an associate
- job applicant
- customer
- member
- supplier
- or person working on behalf of Walmart.

This policy applies to all associates who work for Walmart Inc., or one of its subsidiary companies, in the United States (Walmart).

Managers and supervisors should use the Discrimination and Harassment Prevention Management Guidelines.

# Prohibited conduct

**Discrimination**

We prohibit any discriminatory action based on an individual's status in all aspects of our business.

For purposes of this policy, Discriminatory action includes, but is not limited to

- firing,
- refusing to hire,
- denying training,
- failing to promote or

• discriminating in pay or other terms, conditions or privileges of employment based on an individual's status.

It also includes encouraging or assisting anyone to take discriminatory actions.

We prohibit associates from designing, implementing or executing a business process in any manner that discriminates against, singles out or subjects to heightened scrutiny a person based on an individual's status.

For the purposes of this policy, a business process includes, but is not limited to

• sales and purchase of goods and services

• customer service;

• verification or acceptance of any form of payment, including checks, money orders and credit cards; acceptance of shopping cards, gift cards, gift certificates and coupons;

• refunds, returns and/or exchanges of merchandise;

• surveillance, investigation or detention of suspected shoplifters, and

• use of Electronic Article Surveillance.

**Harassment**

We prohibit any form of harassment based on an individual's protected status in all aspects of our business. This includes, but is not limited to:

• Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors

• Repeated unwanted sexual flirtations, advances, or propositions;

• Using slurs or negative stereotyping;

• Verbal kidding, teasing, joking or making offensive comments about an individual's status, appearance, or sexual activity;

• Leering or making offensive gestures;

• Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, social media, text messages, invitations, or other materials;

• Using company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;

• Intimidating acts, such as bullying or threatening based on an individual's status;

• Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;

• Physical touching or assault, as well as impeding or blocking movements;

• Any other conduct that shows hostility toward, disrespect for or degradation of an individual based on the individual's status.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

**Retaliation**

We prohibit taking negative action against any individual for reporting conduct that violates this policy, cooperating in an investigation, opposing discrimination or harassment, or filing or assisting another individual in filing a complaint of discrimination or harassment with a government agency or court.

# Reporting procedures

We are committed to preventing discrimination and harassment in all aspects of our business and will take all reasonable measures to prevent it. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation.

If you experience, observe or become aware of any conduct that may violate this policy, you should immediately report the violation to any salaried member of management or confidentially and/or anonymously to the Global Ethics Office, email: ethics@walmart.com or phone: 1-800-WMETHIC (1-800-963-8442). If you believe a

salaried member of management may be violating this policy, you do not have to report the violation to that person. You may report the possible violation to another salaried member of management or call/email the Global Ethics Office.

**Managers**

If you observe, receive a report or otherwise become aware of a possible violation of this policy, you must immediately report such conduct to the appropriate level of management for investigation. A salaried member of management who fails to report a violation of this policy may be subject to disciplinary action, up to and including termination.

Appropriate level of management includes, but is not limited to, facility management, Human Resources or Global Ethics.

We will take appropriate steps to ensure there is no retaliation of any kind for using the reporting procedures described in this policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and violates this policy.

# Investigation and appropriate action

We take all reported violations of this policy seriously, and we will promptly and thoroughly investigate all allegations in accordance with the procedures set forth in the management guidelines.

In order to conduct a prompt and thorough investigation, we ask that you cooperate and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to disciplinary action up to and including termination.

We will take appropriate action to eliminate conduct that violates this policy and are committed to ensuring that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported policy violation including, but not limited to, suspension or transfer of the associate who reportedly violated this policy. Suspensions are unpaid; however you may use PTO in accordance with the applicable PTO Policy for scheduled hours during your suspension. If you are suspended and the allegations against you are not substantiated, you will be returned to work and paid for all scheduled hours missed while suspended and applicable PTO used during that time will be reinstated.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an associate has violated this policy (or any other policy), that associate will be subject to disciplinary action up to and including termination and any other appropriate corrective action.

# Confidentiality

Walmart will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution.

# For More Information

If you have questions or need further guidance, please contact

- your HR representative
- Ethics Office using one of these methods:
    - www.walmartethics.com and select "Report a Concern"
    - Access True North on the WIRE and select "Report a Concern"
    - Email: ethics@walmart.com
    - 1-800-WMETHIC (1-800-963-8442)

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: April 22, 2020

# EXHIBIT 3

# Accommodation in Employment - (Medical-Related) Policy

National

**Effective: July 16, 2018**

At Walmart, every associate and job applicant has full access to equal employment opportunities. We will provide associates who have a disability with reasonable accommodations to enable them to perform the essential functions of their jobs, seek new jobs within Walmart, and enjoy the benefits of employment. Walmart will also provide reasonable accommodations during the hiring process to job applicants with a disability.

If you need assistance to perform essential functions of your job due to a medical condition, you may be eligible for a job adjustment (JA) under this policy, whether or not the condition is a disability. You may also be eligible for a leave of absence or a transfer to another open position.

This policy applies to all associates who work for Walmart Inc., or one of its subsidiary companies, in the United States (Walmart), except for associates who work in the following states (Click on the individual state for the policy applicable in that state).

Managers and supervisors should use the appropriate supplemental management guidelines.

Accommodation in Employment (Medical-Related) Management Guidelines - Walmart, Sam's Club and Neighborhood Market

Accommodation in Employment (Medical-Related) Management Guidelines - Supply Chain

Accommodation in Employment (Medical-Related) Management Guidelines - eCommerce

Accommodation in Employment (Medical-Related) Management Guidelines - Home Office

## State Specific Policies

California

Connecticut

Illinois

Iowa

Louisiana

Maine

Maryland

Massachusetts

Minnesota

New Jersey

New Mexico

New York

Oregon

Washington

West Virginia

Wisconsin

# Eligibility guidelines

**Eligibility for a job adjustment due to a medical condition**

You may be eligible for a job adjustment if you are qualified for the job you hold but, because of a medical condition, you need assistance to perform the essential functions of your job.

Job adjustment means a change in practices or the work environment which is both easily achievable and which will have no negative impact on the business. This type of accommodation does not include creating a job, removing or reducing an essential function of your job, transferring a portion of a job to another associate, light duty or temporary alternative duty, or reassignment.

A medical condition means a mental or physical impairment, or a limitation due to pregnancy, childbirth, breastfeeding or a related condition.

**Eligibility for a reasonable accommodation due to a disability**

You may be eligible for a reasonable accommodation if you have the skills, ability, knowledge, certification and experience necessary and can perform the essential functions, either with or without reasonable accommodation for the job you hold or a job you seek but, because of a disability, you need assistance to apply for a new job, or to perform the essential functions of a job.

Disability means a physical or mental impairment that substantially limits one or more major life activities. It also includes a temporary disability caused by pregnancy, childbirth, breastfeeding, or a related condition.

Reasonable accommodation means a change in policy, practices, or the environment which enable an associate with a disability to perform the essential functions of his/her job without creating an undue hardship for the company.

**Reasonable accommodations can include:**

* Making existing facilities more accessible;

000019
Walmart/Gaggos Statement of Position

- Providing assistive devices or modify equipment;
- Changing non-essential job functions;
- Providing part-time or modified work schedules;
- Providing readers or interpreters;
- Permitting the use of accrued paid leave and
- Providing unpaid leave or reassignment to an open vacant position.

If, due to pregnancy, childbirth, breastfeeding, or a related condition, you are unable to perform the essential functions of your job with another reasonable accommodation, you may be eligible for Temporary Alternative Duty (TAD).

**Reasonable accommodations do not include:**

- Reassignment to a job that is not vacant;
- Creating a new job;
- Eliminating essential functions of a job or transferring an essential function to another associate;
- Providing assistive devices needed outside of the workplace (such as eyeglasses or hearing aids) or
- Providing an accommodation that is excessively costly, disruptive, or would alter the nature or operation of the business, which would be deemed as an undue hardship.

In some circumstances, the reasonable accommodation may include reassignment to a vacant job for which you are qualified. However, this option will occur only if there is no effective reasonable accommodation in your current job or when an accommodation in your current job would create an undue hardship. While Walmart will attempt to reassign you to an open, vacant job with comparable hours, pay, and other benefits of employment, an offer may also be made to a lower level position. Upon reassignment to either a lateral position or lower level position, you will be paid according to the reassigned job.

# Accommodation process

**Requesting a job adjustment or reasonable accommodation due to a medical condition or disability**
You may request a job adjustment or reasonable accommodation, at any time by telling any salaried member of management in your facility or an HR representative that, because of your condition, you need help to do your job or gain access to your workplace. A family member, friend, job coach or health care professional may request such a change on your behalf.

You also may request a job adjustment or a reasonable accommodation if you need assistance applying for a new job, completing an assessment for a new job or to gain access to any other benefit of employment.

If you have contact with an applicant for a job at Walmart who makes a request for an accommodation, you must inform a salaried member of management immediately.

Certain job adjustments can be approved by facility management. Your facility management team will first consider whether your request can be approved as a job adjustment. If your facility management is unable to grant your request for a job adjustment or if your accommodation needs cannot be met by an available job adjustment, you should make a formal request for accommodation from Walmart's Accommodation Service Center (ASC) by calling 1-855-489-1600. A family member, friend, job coach, health care professional, or member of management may also request a reasonable accommodation on your behalf.

After you request an accommodation based on a medical condition, we will provide you with a packet containing information helpful to you. The packet will include a Medical Questionnaire form that we may need your health care provider to complete in order to provide us with information needed to properly respond to your request. As soon as we receive the information we need, we will begin working with you to determine whether or not you are eligible for a job adjustment due to your medical condition. If a job adjustment is not granted, we will continue to work with you to determine whether you are eligible for a reasonable accommodation due to a disability. If you are a qualified individual with a disability, we will determine whether there is a reasonable accommodation that will be effective to meet your individual needs. It is important that you engage in an interactive process and provide us information that will assist in understanding your abilities. Walmart welcomes your accommodation suggestions.

The accommodation process is voluntary, and you may withdraw a request for accommodation at any time. However, if you have medical restrictions, we may need to evaluate whether those restrictions will allow you to perform the essential functions of your job, either with or without reasonable accommodation.

**Medical documentation**
When you request an accommodation, we may request that you provide medical documentation regarding your condition in order to assist us in evaluating your request. When requested, you must provide medical documentation from a health care professional explaining the nature of your medical condition, the extent of any limitations you have, and whether a reasonable accommodation will enable you to perform the essential functions of your job. If you do not provide appropriate or adequate information within 20 days of your request, or you do not cooperate in our efforts to obtain such information, we may administratively close your request for accommodation. You are free to re-apply for a reasonable accommodation at any time.

In some cases, you may be granted a job adjustment to accommodate your request for accommodation (based on a medical condition). In other cases, your request may be evaluated as a request for accommodation (due to a disability). After you provide all relevant information, your request will be promptly evaluated and a determination will be made. You will be provided with a copy of a Determination Letter.

**Requests for Reconsideration**

If the specific accommodation (due to disability) you requested is not approved, you may request reconsideration of the determination within 30 days of your receipt of the Determination Letter. You may request reconsideration by either calling 1-855-489-1600 or completing a Request for Reconsideration Form, which will be included with the Determination Letter. If you elect to complete the form, you should fax your completed Request for Reconsideration Form, with any new or additional medical or other information, to the Accommodation Service Center (ASC) at 1-859-280-3264. ASC will decide your Request for Reconsideration within five business days of receiving your request and all relevant information. You will be provided a copy of final determination. You may request reconsideration of a final determination by submitting new or additional medical information that is relevant to your request.

# Confidentiality

Walmart will make every reasonable effort to maintain the confidentiality of all information related to your request for a reasonable accommodation, including your medical information. Walmart will disclose medical information to only those who have a need to know in order to resolve your accommodation request.

# Retaliation and discrimination

We strictly prohibit discrimination or harassment against any associate, job applicant, customer, member, supplier or person working on behalf of Walmart on the basis of a disability, a perceived disability, a record of having a disability or a known close relationship with an individual who has a disability.

Walmart prohibits taking negative action against any associate or job applicant for requesting an accommodation, reporting conduct that may violate this policy, filing a complaint of discrimination or retaliation with a government agency or court, assisting another individual in reporting conduct that may violate this policy, assisting another individual in filing a complaint of discrimination or retaliation with a government agency or court, cooperating in an investigation or opposing discrimination or retaliation.

**Reporting discrimination or retaliation**

We are committed to preventing discrimination or retaliation in all aspects of our business. We will take all reasonable measures to prevent discrimination or retaliation. However, if we are not aware that discrimination or retaliation is taking place, we cannot address the situation. If you experience conduct that may violate this policy or if you observe or become aware of any conduct that may violate this policy by being discriminatory or retaliatory, you should immediately report the violation to any salaried member of management or confidentially and anonymously to the Global Ethics Office, 1-800 WMETHIC (1-800-963-8442). Managers, who observe, receive a report or otherwise become aware of a possible violation of this policy must immediately report such conduct to the appropriate level of management for investigation. A salaried member of management who fails to report a violation of this policy may be subject to disciplinary action, up to and including termination.

*Appropriate level of management includes, but is not limited to, the Field Supply Chain Human Resources Manager, Employment Advisor, Market Human Resources Manager, Regional Human Resources Manager, People Director or HR Business Partner.*

We will take appropriate steps to ensure that there is no retaliation of any kind for using the reporting procedures described in this policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and violates this policy.

# Investigation and appropriate action

We will take any reported violation of this policy seriously, and we will promptly and thoroughly investigate any report of a possible violation in accordance with the procedures set forth in the management guidelines.

You must cooperate with and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any associate who refuses to cooperate in an investigation or fails to tell the truth during an

We will take appropriate action to eliminate conduct that violates this policy and to ensure that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported policy violation including, but not limited to, suspension or transfer of the associate who reportedly violated this policy.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an associate has violated this policy (or any other policy), that associate will be subject to disciplinary action up to and including termination and any other appropriate corrective action.

# For More Information

If you have questions or need further guidance, please contact your HR representative.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: October 23, 2019

# EXHIBIT 4

# FMLA Leave of Absence Policy
National

Updated: November 23, 2020

**State Specific Policies**

At Walmart, we recognize that there are times when family and medical issues necessitate time away from work. If you are eligible for a family or medical leave, we will provide you with a job protected leave of absence in accordance with the Family and Medical Leave Act (FMLA) and applicable state laws.

If you have questions regarding leave of absence matters, contact Sedgwick, our Leave of Absence administrator through Sedgwick's online system, mySedgwick, which can be accessed on OneWalmart. Sedgwick may also be contacted by calling 1-800-492-5678.

This policy applies to all associates who work for Walmart Inc. (Walmart), or one of its subsidiary companies, in the United States except for associates who work in the individual states which are noted in the column to the right. Walmart prohibits discrimination or retaliation against you for requesting or taking FMLA leave.

Managers and supervisors should visit the LOA for Leaders Playbook for additional guidance in administering the policy.

# Eligibility

You are eligible for FMLA leave if you have

- been employed at Walmart for a total of at least 12 months and
- have worked at least 1250 hours during the 12-month period prior to the start of the FMLA leave.

*Important: You must meet both eligibility requirements each time you take leave for different reasons.

If you do not meet FMLA eligibility requirements, you may be eligible for other types of leave. Visit the Personal Leave of Absence policy for other leave options.

# Qualifying circumstances and amount of leave

If you are eligible for FMLA you may take leave for the qualifying circumstances below. All your FMLA leave will count towards your total FMLA leave entitlement even though you may receive compensation such as PTO, workers' compensation, or other wage replacement benefits during your FMLA leave.

## Medical Leave

You may take medical leave for up to 12 weeks in a rolling 12-month period due to your own serious health condition.

A *serious health condition* means an illness, injury, impairment, or physical or mental condition certified by your health care provider that involves either (1) inpatient care or (2) incapacity for more than three days or periodic incapacity and ongoing treatment. It includes chronic conditions for which no treatment may be effective. It includes any incapacity due to pregnancy, for prenatal care and may include work-related conditions.

## Family Leave

You may take family leave for up to 12 weeks in a rolling 12-month period for the following events or circumstances:

- Birth and care of a child within 12 months of birth
- Adoption or foster placement of a child and care within 12 months of placement

State Specific Policies list:

California

Colorado

Connecticut

District of Columbia

Hawaii

Indiana

Iowa

Kansas

Kentucky

Louisiana

Maine

Maryland

Massachusetts

Minnesota

Montana

New Hampshire

New Jersey

New York

Ohio

Oregon

Rhode Island

Tennessee

Vermont

Washington

Wisconsin

000024
Walmart/Gaggos Statement of Position

12/16/2020                                                  FMLA Leave of Absence Policy

- Care for a child, parent or spouse who suffers from a serious health condition

*Child* means your biological, adopted, or foster child, stepchild, legal ward, or child for whom you have the day-to-day responsibility to provide care and financial support, so long as the child is under 18 years old or unable to take care of him/herself due to a disability.

*Parent* means your biological parent or the person who had the day-to-day responsibility to provide care and financial support to you as a child. Parent does not include your parent-in-law.

*Spouse* means an individual legally married to an associate. This includes same-sex or common law marriages that were entered into in a State recognizing such marriages. It also includes marriages that take place outside the United States, provided the marriage was legal in that location and could have been entered into in at least one US State.

# Military Family Exigency

You may take leave for up to 12 weeks in a rolling 12-month period for any qualifying exigency arising out of the fact that your child, spouse, or parent is a member of the Armed Forces (including the National Guard or Reserves) who is on active duty or has been notified of an impending call or order to active duty, in a foreign country.

Qualifying situations are:

- Short notice deployment of seven days or less (for which you are limited to seven days leave);
- Military events and related activities;
- Childcare and school activities (to arrange or provide childcare; to transfer or enroll in a new school; to attend childcare/school-related meetings);
- Childcare and school activities (to arrange or provide childcare on an urgent, immediate need [not regular] basis; to transfer or enroll in a new school; to attend childcare/school related meetings);
- Financial and legal arrangements (to make or update financial or legal arrangements; to act as the servicemember's representative for purposes of benefits);
- Counseling (non-medical related);
- Rest and recuperation (for which you are limited to fifteen days leave);
- Post-deployment activities (arrival ceremonies or other official programs for up to 90 days after the servicemember returns home, including to address issues arising from the death of the servicemember) or
- Anything else you and Walmart mutually agree to consider exigent circumstances

For purposes of Military Family Exigency, *child* includes your adult child.

# Military Family Care

You may take leave for up to 26 weeks in a single 12-month period because you are needed to care for your child, spouse, parent, or next of kin who is:

- A member of the Armed Forces (including the National Guard and Reserves) and who has a serious injury or illness for which s/he is (1) undergoing medical treatment, recuperation, or therapy, (2) in outpatient status, or (3) on the temporary disability retired list; or
- A veteran of the Armed Forces (including the National Guard or Reserves) who has a serious injury or illness for which s/he is undergoing medical treatment, recuperation, or therapy, and who was a member of the Armed Forces at any time during the period of five years preceding the first date of your leave. (If the veteran was discharged or released prior to March 8, 2013, the time period of October 28, 2009 to March 8, 2013 is excluded for purposes of calculating five years.)

During the single 12-month period, you may take a combined total of 26 weeks of Military Family Care leave and leave for any other qualifying FMLA reason (subject to the 12-week limitation for all other such reasons).

A single 12-month period begins on the first day you take Military Family Care leave, as described above, and ends 12 months after that date, regardless of whether you take the full 26 weeks of available leave.

This single 12-month period is applied on a per-covered servicemember, per-injury basis. You may be able to take Military Family Care leave during a subsequent single 12-month period if you are needed to care for a different qualifying family member or to care for the same family member who suffers a new serious injury or illness. You may not take more than 26 workweeks of Military Family Care leave or combined Military Family Care and other FMLA leave, within any single 12-month period.

For purposes of Military Family Care leave, *child* includes your adult child.

*Next of kin* means, in the following order of priority, (a) your nearest blood relative who has legal custody of the covered servicemember by court decree or statutory provisions, (b) brothers and sisters, (c) grandparents, (d) aunts and uncles and (e) first cousins, unless the covered servicemember has specifically designated in writing another blood relative as his/her nearest blood relative.

*Outpatient status* means assignment to (1) a military medical treatment facility as an outpatient or (2) a unit established for the purpose of providing command and control of members of the Armed Forces receiving medical care as outpatients.

*Veteran* means a person who served in the federal active or reserve military and who was discharged or released under conditions other than dishonorable.

*Week* means the average number of hours you are scheduled in a workweek. If you have a varying schedule, your workweek will be calculated based on an average over the last 12 months.

*Serious injury or illness* means:

- For current members of the Armed Forces (including the National Guard or Reserves), an injury or illness that was incurred by the servicemember in line of duty on active duty in the Armed Forces (or existed before the beginning of the servicemember's active duty and was aggravated by service in line of duty on active duty) and that may render him/her medically unfit to perform the duties of his/her office, grade, rank or rating
- For a veteran of the Armed Forces (including the National Guard or Reserves), a serious injury or illness that was incurred by the veteran in the line of duty on active duty in the Armed Forces (or existed before the beginning of the veteran's active duty and was aggravated by service in line of duty) and that manifested itself before or after he/she became a veteran, and is:
  - a continuation of a serious illness or injury that was incurred or aggravated when the veteran was a member of the Armed Forces and rendered the veteran unable to perform the duties of his/her office, grade, rank or rating;
  - a condition for which the veteran has received a VA Service-Related Disability Rating (VASRD) of 50% or greater, based in whole or in part on the condition for which care is required;
  - a condition that substantially impairs the veteran's ability to work by reason of a disability related to military service, or would do so absent treatment; or
  - a physical or psychological injury for which the veteran has been enrolled in the VA Program of Comprehensive Assistance for Family Caregivers.

# Requesting FMLA leave

## Notice

You must give 30 days' advance notice to your manager and Sedgwick if the need for leave is foreseeable. You may provide notice to Sedgwick by submitting your leave request online through mySedgwick or by calling Sedgwick at 1 (800) 492-5678.

If the need for leave is not foreseeable, you must give notice as soon as possible, generally the same day or the following business day after learning that you need to take leave. If you cannot give personal notice due to an emergency, your authorized representative may give notice.

After you provide notice of your need for leave, Sedgwick will notify you whether you are eligible for FMLA leave and whether you have FMA leave available. You will be required to submit the appropriate certification forms to Sedgwick within 20 days of when the  Notice of Eligibility and Rights & Responsibilities were mailed by Sedgwick.

If you miss work for more than three days because you or a family member are ill or injured, you should immediately contact Sedgwick, so it can be determined whether FMLA leave is available to you.

If you intentionally provide inaccurate information on any FMLA leave form, or use FMLA leave for any reason other than that for which your leave was requested and approved, you may be subject to disciplinary action up to and including termination.

## Certification of FMLA leave

If you need to take FMLA leave, you must submit the appropriate completed certification form to Sedgwick. Sedgwick will provide you with the appropriate forms.

If you do not provide reasonable notice and/or a timely certification, as described above, you may have your FMLA leave delayed or denied and your absences may not be protected under the FMLA.

For Medical, Family Care and Military Family Care leaves, it is your responsibility to provide the form to the appropriate health care provider and to ensure that he/she completes the form and signs it. You must return the completed form to Sedgwick promptly, generally within 20 days of when the Notice of Eligibility and Rights & Responsibilities is mailed by Sedgwick. If you are unable to promptly return the form due to circumstances outside your control, you must contact Sedgwick to discuss the reason for the delay and you must submit the form as soon as possible. A decision about whether you are entitled to FMLA leave cannot be made until you return the completed certification form.

Sedgwick may require a second medical opinion regarding the certification for Medical or Family Care leave, or regarding certain certifications for Military Family Care leave. If there is any conflict between the original and

000026
Walmart/Gaggos Statement of Position

12/16/2020                                                    FMLA Leave of Absence Policy

second medical opinions, Sedgwick may require the opinion of a third health care provider jointly designated or approved by Sedgwick and you. The opinion of the third health care provider will be controlling. You will not be required to pay for any required second or third opinions, and you will be reimbursed for reasonable out of pocket travel expenses, where appropriate.

## Continuous/Intermittent/Reduced schedule leaves

FMLA leave may be taken *continuously*, on a *reduced schedule* or on an *intermittent basis*.

*Continuous* leave means leave taken in a continuous period of time without interruption, typically lasting more than 3 calendar days.

*Intermittent* leave means leave taken in separate blocks of time due to a single reason. Examples would include taking periods of time off (partial days, full days, or multiple days) for chemotherapy treatments, physical therapy, or prenatal care.

*Reduced schedule* leave means a leave schedule that reduces your typical hours per day or per week.

You should try to schedule intermittent or reduced schedule FMLA leave to accommodate Walmart's business operations. For example, if you can schedule medical appointments during non-work times, you should do so.

If you request intermittent or reduced schedule FMLA leave, your position may be modified, or you may be temporarily transferred to an available alternative or part-time position for which you are qualified, and which better accommodates your need for such leave. Although this position may not involve the same type or level of job duties, your rate of pay and benefits will remain the same.

You may take intermittent or reduced schedule FMLA leave only when:

- Your health care provider certifies it is *medically necessary* for medical treatment or to recover from your serious health condition;
- You cannot perform the essential functions of your position because of a chronic serious health condition;
- A health care provider determines it is *medically necessary* for you to care for your child, spouse, or parent who suffers from a serious health condition;
- A health care provider determines it is *medically necessary* for you to care for your child, spouse, parent, or next of kin who is member or veteran of the Armed Forces who has a serious injury or illness, as described above or
- You are needed because of a qualifying circumstance arising out of the fact that your child, spouse or parent is a member of the Armed Forces and is on or has been called to active duty in a foreign country.
- Prior to the actual foster care placement or adoption of a child if an absence from work is required for the placement or adoption to proceed. Examples include attending counseling sessions, appearing in court, consulting with attorneys and doctors representing the birth parent or submitting to a physical examination.

*Medically necessary* means that your health care provider has determined that, due to medical need, you must take time off from work intermittently or to work a reduced schedule.

## Extending FMLA leave

If you need to extend your leave beyond your original FMLA request, you must request an extension as soon as possible by contacting your manager and Sedgwick. You will be required to submit documentation supporting your continued need for leave. A failure to timely submit required documentation may result in a delay in making a decision on your request, or a denial of the request.

If you need to extend your leave beyond your available FMLA leave time, contact Sedgwick to discuss what other leave options might be available to you.

If you do not notify your manager and Sedgwick that you need to extend your leave or do not report to work, you may be deemed to have voluntarily terminated your employment from Walmart, except where prohibited by law.

## Re-certification

You may be required to submit a new certification form every six months, in connection with an absence, and may be required to submit a new certification form if:

1. Your leave expires and you request an extension or

2. Circumstances described in your original request have changed significantly or

3. Something happens to cast doubt on the reason for the absence or the continuing validity of the certification.

000027
Walmart/Gaggos Statement of Position

When a new certification form has been requested by Sedgwick, you should return the completed form within 20 calendar days. If circumstances outside your control prevent you from doing so, you must contact Sedgwick to discuss the delay and you must submit the form as soon as possible. Your continued ability to take FMLA leave depends on your timely submission of the certification form as well as your continuing eligibility for FMLA leave that is available to you. If you do not provide a timely certification, as described above, you may have your FMLA leave delayed or denied, and your absence may not be protected under the FMLA.

# Pay during FMLA leave

FMLA leave is unpaid; however, you may utilize available income replacement benefits, as described below.

- You may qualify for short- or long-term disability benefits if the leave is related to your own serious health condition. To apply for disability benefits, call Sedgwick at 1-800-492-5678.
- You may qualify for workers' compensation benefits, if your serious health condition is work-related.
- You may use PTO or other benefit time available to you consistent with the applicable policy.

NOTE:  If there is a change in your rate of pay while you are on leave, the change will be effective on the date you return to work.

Regardless of whether you receive any pay during your FMLA leave, all absences that are designated as FMLA leave will count toward your available FMLA entitlement under this policy.

# Maintaining benefits during FMLA leave

In order to continue medical and dental coverage during any portion of your leave that is unpaid, you will need to pay your premiums. Premiums must be submitted every two weeks by check, money order or credit card. Failure to submit payments within 30 days of the due date may result in cancellation of your coverage. Contact Benefits by calling 1-800-421-1362 .

Additionally, if you pay your premiums, you can maintain the following additional insurance:

- Accidental Death and Dismemberment Insurance

- Dependent Life Insurance

- Life Insurance

- Short-Term Disability Insurance (if you purchased the buy-up)

- Long-Term Disability Insurance

For information regarding other benefits available to you during FMLA leave, click here.

# Returning from FMLA leave

You should contact your supervisor, People Partner and Sedgwick at least three weeks before you intend to return to work, or as soon you no longer require leave. When returning to work from a medical leave, a medical release form from your health care provider will be required. If your health care provider releases you to return to work with restrictions, you may be eligible for a reasonable accommodation under the Accommodation in Employment (Medical Related) Policy  Work with your Sedgwick representative to determine the process to apply for an accommodation, if needed.

## Position upon return from FMLA leave

If you return to work on or before the expiration date of your available FMLA Leave, we will reinstate you to your former position or to a position that provides you with the same rate of pay, status, employment benefits and other terms and conditions that you had before you took FMLA Leave, unless you would have been laid off or terminated had you not been on FMLA Leave. You will not lose any credit for continuous service or other benefits accumulated before taking FMLA Leave. If you cannot perform the essential functions of your former job or an equivalent one and are not eligible for a reasonable accommodation, we may offer you an open position for which you are qualified and which you can perform, or you may request a transfer to another open position under  the Job Transfers and Postings Policy. Supply Chain associates may request transfer under the Associate Job Transfer Program.

000028
Walmart/Gaggos Statement of Position

If you return to work after you have used all of your available FMLA Leave, you are not guaranteed your previous position or any other position. We will make reasonable efforts to assist you in applying for an open position that you are qualified to perform, based on your facility's business needs at the time you return. If you were a full-time associate before you took FMLA Leave, we will make reasonable efforts to return you to a full-time position. If you worked part-time before you took FMLA Leave, we will make reasonable efforts to return you to a part-time position. If you are offered a position and accept it, your hours and pay will be based on the position offered.

## Failure to return from FMLA Leave

If you do not return to work after you have used all of your available FMLA Leave, you may be eligible to take personal leave. If you wish to take personal leave, you must submit your leave request to Sedgwick. If you do not return to work or request additional leave, you may be deemed to have voluntarily terminated your employment from Walmart, except where prohibited by law. You may reapply for employment with Walmart later, if you choose to do so.

# Using the Open Door concerning a leave of absence decision

If your request for a leave of absence has been denied, you may use the Open Door. You should first contact your leave specialist at Sedgwick to discuss your concerns. If you still have concerns after the discussion with your leave specialist, you may use the Open Door Communications Policy with your facility and they will advise you on next steps.

# For More Information

If you have questions or need further guidance, please contact Sedgwick at 1-800-492-5678 or your People Partner.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: November 23, 2020

# EXHIBIT 5

000030
Walmart/Gaggos Statement of Position

| FIRSTNAME | LASTNAME | ACTIVITYNAME | STATUS | STARTDT(GMT) | END |
|-----------|----------|--------------|--------|--------------|-----|
| JOE | GAGGOS JR | Associate Safety (Obsolete) | passed | 1995-10-02 05:00:00.000 | 1995-10-02 |
| JOE | GAGGOS JR | Coaching for Improvement | passed | 1995-10-02 05:00:00.000 | 1995-10-02 |
| JOE | GAGGOS JR | Associate Safety | passed | 1995-10-02 05:00:00.000 | 1995-10-02 |
| JOE | GAGGOS JR | Sexual Harassment Hourly | passed | 1996-06-27 05:00:00.000 | 1996-06-27 |
| JOE | GAGGOS JR | Sexual Harassment Hourly | passed | 1996-06-27 05:00:00.000 | 1996-06-27 |
| JOE | GAGGOS JR | Bloodborne pathogens | passed | 1997-08-29 05:00:00.000 | 1997-08-29 |
| JOE | GAGGOS JR | Hazard Communications | passed | 1997-08-29 05:00:00.000 | 1997-08-29 |
| JOE | GAGGOS JR | Bloodborne Pathogens | passed | 1997-08-29 05:00:00.000 | 1997-08-29 |
| JOE | GAGGOS JR | Hazard Communications | passed | 1997-08-29 05:00:00.000 | 1997-08-29 |
| JOE | GAGGOS JR | Inappropriate Behavior | passed | 1999-06-19 05:00:00.000 | 1999-06-19 |
| JOE | GAGGOS JR | Family Medical Leave Act | passed | 1999-06-19 05:00:00.000 | 1999-06-19 |
| JOE | GAGGOS JR | Family Medical Leave Act | passed | 1999-06-19 05:00:00.000 | 1999-06-19 |
| JOE | GAGGOS JR | Inappropriate Behavior | passed | 1999-06-19 05:00:00.000 | 1999-06-19 |
| JOE | GAGGOS JR | Yard Driver | passed | 1999-06-19 05:00:00.000 | 1999-06-19 |
| JOE | GAGGOS JR | Power Equipment Safety | passed | 2001-01-10 19:18:00.000 | 1996-02-05 |
| JOE | GAGGOS JR | Power Equipment Safety          (1.0) | passed | 2001-01-10 19:18:00.000 | 1996-02-05 |
| JOE | GAGGOS JR | Corporate Ethics | passed | 2005-01-05 22:10:00.000 | 2005-01-05 |
| JOE | GAGGOS JR | Accommodations and Accessibility | passed | 2005-01-05 22:21:00.000 | 2005-01-05 |
| JOE | GAGGOS JR | ADA | passed | 2005-01-05 22:21:00.000 | 2005-01-05 |
| JOE | GAGGOS JR | Diversity & Inclusion Hourly | passed | 2005-04-22 17:14:00.000 | 2005-04-22 |
| JOE | GAGGOS JR | Personal Information Verification | passed | 2007-02-22 13:08:00.000 | 2007-02-22 |
| JOE | GAGGOS JR | MicroMessaging: The Power of Small | passed | 2012-04-20 05:00:00.000 | 2012-04-20 |
| JOE | GAGGOS JR | Texas Injury Care Benefit Plan | passed | 2012-04-20 05:00:00.000 | 2012-04-20 |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) | passed | 2013-03-03 06:00:00.000 | 2013-03-03 |
| JOE | GAGGOS JR | Sexual Harassment Hourly | passed | 2013-07-12 20:30:00.000 | 2013-07-12 |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) | completed | 2014-05-23 19:48:55.000 | 2014-05-23 |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) (1.0) | completed | 2014-05-23 19:48:55.000 | 2014-05-23 |
| JOE | GAGGOS JR | Workplace Respect | completed | 2014-05-25 15:36:17.000 | 2014-05-25 |
| JOE | GAGGOS JR | Workplace Respect (1.3) | completed | 2014-05-25 15:36:17.000 | 2014-05-25 |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) | completed | 2015-06-04 20:17:17.000 | 2015-06-04 |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) (1.0) | completed | 2015-06-04 20:17:17.000 | 2015-06-04 |
| JOE | GAGGOS JR | Sexual Harassment Hourly | completed | 2015-07-01 17:47:31.000 | 2015-07-01 |
| JOE | GAGGOS JR | Sexual Harassment Hourly (1.0) | completed | 2015-07-01 17:47:31.000 | 2015-07-01 |

| JOE | GAGGOS JR | Logistics OJT Fatigue Management Training | passed | 2016-01-01 14:00:00.000 | 2016-08-3: |
| JOE | GAGGOS JR | Logistics OJT Fatigue Management Training | passed | 2016-01-01 14:00:00.000 | 2016-08-3: |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) | completed | 2016-07-12 18:30:35.000 | 2016-07-1: |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) (1.2) | completed | 2016-07-12 18:30:35.000 | 2016-07-1: |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) | completed | 2017-08-16 11:18:31.000 | 2017-08-1( |
| JOE | GAGGOS JR | A Safer Workplace: Hourly (Annual) (1.2) | completed | 2017-08-16 11:18:31.000 | 2017-08-1( |
| JOE | GAGGOS JR | Sanitary Food Transportation | completed | 2017-08-16 11:20:38.000 | 2017-08-1( |
| JOE | GAGGOS JR | Sanitary Food Transportation (1.0) | completed | 2017-08-16 11:20:38.000 | 2017-08-1( |
| JOE | GAGGOS JR | Ethics Privacy Information Security & Records | completed | 2018-01-22 15:25:02.000 | 2018-01-2: |
| JOE | GAGGOS JR | Ethics Privacy Information Security & Records (1.3) | completed | 2018-01-22 15:25:02.000 | 2018-01-2: |
| JOE | GAGGOS JR | Workplace Respect Hourly | completed | 2018-01-22 15:41:25.000 | 2018-01-2: |
| JOE | GAGGOS JR | Workplace Respect Hourly (1.1) | completed | 2018-01-22 15:41:25.000 | 2018-01-2: |
| JOE | GAGGOS JR | Texas Injury Care Benefit Plan Annual | completed | 2019-10-15 21:18:55.840 | 2019-10-1! |
| JOE | GAGGOS JR | Texas Injury Care Benefit Plan Annual (1.0) | completed | 2019-10-15 21:18:55.840 | 2019-10-1! |
| JOE | GAGGOS JR | FY20 Q3 Supply Chain Active Shooter Refresher | completed | 2019-10-15 21:22:38.587 | 2019-10-1! |
| JOE | GAGGOS JR | FY20 Q3 Supply Chain Active Shooter Refresher (1.0) | completed | 2019-10-15 21:22:38.587 | 2019-10-1! |

# EXHIBIT 6

 **HEARTSTRONG** *sleep centers*

9450 Grogans Mill Road, Suite 150
The Woodlands, Texas 77380
Phone: 877.371.4517 Fax: 877.572.9837

### *Therapeutic Polysomnography - 95811*

| Patient: | Gaggos, Joe | Study Date: | 06/30/2019 |
|---|---|---|---|
| DOB | | Age (years): | 62 |
| Height: | | Weight (lbs): | |
| Gender: | Male | BMI: | |
| PSG Tech: | Johnson, Luke | Scoring Tech: | Azealiix, Kaylea |
| Referring Provider: | Kathy Wilson M.D. | Interpreting: | Kathy Wilson M.D. |

**INDICATIONS:** Joe Gaggos is a 62 year old Male who returns to center following a diagnosis of Obstructive Sleep Apnea via in lab polysomnography on 5/31/2019. The overall AHI was 14.0 and the SaO2 nadir was 90%.

**ACQUISITION TECHNIQUE:** The patient underwent an attended overnight polysomnography titration to assess the effects of CPAP therapy. The following variables were monitored: EEG (C4-A1, C3-A2, O1-A2, O2-A1, F3-M2, F4-M1), EOG, submental and leg EMG, ECG, oxyhemoglobin saturation by pulse oximetry, thoracic and abdominal respiratory effort belts, nasal/oral airflow by pressure sensor, body position sensor and snoring sensor. Hypopneas were scored per AASM definition 1B (4% desaturation). BPAP Therapy was initated at IPAP 8, EPAP 4 cmH2O and titrated to eliminate apneic events & snoring and stabilize SpO2 above 90%.

**TECHNICIAN COMMENTS:** Arrived for BPAP titration per SSD program. Says Wal-Mart wants him on a machine. Tolerated the 10-20 well. Tolerated the CPAP trial well. Tried ResMed P-10 in large Nasal pillows. EEG recorded. EKG recorded. Snore recorded. Only soft snore in REM noted. Hypopneas noted. Mouth breathing noted.  Added Chin strap. Changed to nasal mask with chin strap. He then had a severe night sweat and mouth open and keeping mouth open. Tech in and he went to restroom. Fixed EEG leads. Changed him to a FFM in Medium. After FFM he did very well. Breathing and EEG clearer. BPAP to 12/8. Hypopneas and soft snore eliminated.

**SLEEP ARCHITECTURE:** The study began at 21:29:01 and ended at 04:48:02. Total recording time was 448.7 minutes. During the study, there was a total sleep time of 321 minutes and a sleep efficiency of 81.7%. The patient's sleep latency was 0.0 minutes. There was a total of 26.8% REM sleep with the REM latency of 260.5 minutes. There was 3.3% stage 1 sleep, 59.7% stage 2, and 19.2% stage 3 sleep.

**RESPIRATORY:** The overall AHI was 6.7 per hour, and the RDI was 6.7 events/hour with a central apnea index of 4.1per hour. **The most appropriate setting of BiPAP was 12/8 cm H2O.** At this setting, the sleep efficiency was 100% and the patient was supine for 0%. The AHI was 2.8 events per hour,  and the RDI was 2.8 events/hour (with 1 central event) and the arousal index was 7.9 per hour.  The oxygen nadir was 95% during sleep. The respiratory arousal index was 0.0/hr.

**ECG:** Normal sinus rhythm without evidence of abnormalities. Average heart rate was 56, with a maximum of 384 and minimum of 15.

**LEG MOVEMENTS:** There were a total of 0 Periodic Limb Movements (PLMs). The PLM index was 0.0 with a PLM arousal index of 0.0. Total number of Limb Movements was 4 with an LM index of 0.7 and a LM arousal index of 0.0.

**IMPRESSIONS**
- Reduced sleep efficiency, short primary sleep latency, long REM sleep latency and normal slow wave latency.
- Optimal pressure attained with BiPAP IPAP 12, EPAP 8 cm H2O.
- Snoring was eliminated with BiPAP.
- No significant periodic leg movements (index 0.0 is normal).
- EKG showed no cardiac abnormalities.

 HEARTSTRONG *sleep centers*

9450 Grogans Mill Road, Suite 150
The Woodlands, Texas 77380
Phone: 877.371.4517 Fax: 877.572.9837

## *Therapeutic Polysomnography - 95811*

### DIAGNOSIS
- Obstructive Sleep Apnea (327.23 [G47.33 ICD-10])

### RECOMMENDATIONS
- BiPAP IPAP 12, EPAP 8 cm H2O with a Medium size Resmed Full Face Mask AirFit F20 mask and heated humidification.
- Avoid alcohol, sedatives and other CNS depressants that may worsen sleep apnea and disrupt normal sleep architecture.
- Sleep hygiene should be reviewed to assess factors that may improve sleep quality.
- Weight management and regular exercise should be initiated or continued.
- The patient should return to the referring provider for discussion of these results and treatment of sleep disorders.

### SIGNATURE

*Kathy Wilson MD*

Electronically Authenticated By Kathy Wilson M.D. on 03 Jul 2019 16:41, from 173.174.7.91
Kathy Wilson M.D.
NPI: 1003884933

# EXHIBIT 7

January 9, 2020

# DISABILITY AND LEAVE APPROVAL



sedgwick
caring counts

Joe R. Gaggos Jr

Dear Joe:

We are pleased to inform you that your request for short-term disability (STD) pay and a leave of absence have been approved. We are here to support you and to answer your questions as the process moves forward.

*Here are some important details about your disability pay and leave of absence request:*

**Leave**
→ **Leave case number:** B910250204800725AA
→ **Leave dates approved:** 10/27/2019 - 02/03/2020

- Walmart Medical dates: 10/27/2019 - 02/03/2020 = **14.40 week(s)** (Non job-protected)

Note: The leave types listed above are running at the same time. Your position is not to be replaced for the dates listed as job-protected.
→ **Estimated return to work date:** unknown

**Pay**
→ **Disability claim number:** 30193784202-0001
→ **Disability dates approved:** 10/27/2019 - 01/17/2020
- Waiting period dates: 10/27/2019- 11/02/2019
- Disability pay dates: 11/03/2019 - 01/17/2020
→ **Disability pay:** Driver STD Benefits: 75% of average day's pay for up to 25 weeks, following a 7 calendar day waiting period which begins on the first work day missed.

- **PTO:** To continue receiving pay during any unpaid days, you may use available PTO. Please coordinate with your HR manager.

*Here's what you need to do:*

**Return to work**
- Obtain and submit a written release/**Return to work certification form** to your HR manager as soon as possible.
- Contact your HR manager to schedule a DOT medical exam.
- Your HR manager will submit a written release/**Return to work certification form** to Sedgwick via email or fax. If you are released with restrictions, you may still be able to return to work. Sedgwick will review the restrictions to see if we can assist you with returning you to work.
- Notify your manager/HR representative as soon as possible to make plans for your return to work and to discuss options available to you.
- On your first day back, notify Sedgwick of your return to work by phone or mySedgwick®.

For your convenience, the **Return to work certification form** has been provided in this packet.

# DISABILITY AND LEAVE APPROVAL



sedgwick
caring counts

phone:

## Extension

If you are not able to return to work when expected and need to extend your time away from work, contact Sedgwick to request an extension before your approved end date, 01/17/2020, or your disability pay will end.

**Find Top Doctors and Get Expert Medical Advice at No Cost**

If you are covered under the Walmart HRA High Plan, HRA Plan, or HSA Plan you have access to Grand Rounds. Get matched with top-ranked, in-network doctors or get an expert remote second opinion on a diagnosis or treatment plan at no additional cost to you. Grand Rounds will take care of all of the details, like booking appointments and gathering medical records. Visit grandrounds.com/walmart or call                     o get started.

We are here to help. Resources are available through mySedgwick® and accessible at                     You can also contact the Walmart Disability and Leave Service Center at :                     Monday through Friday from 7:00 a.m. – 7:00 p.m. and Saturdays 7:30 a.m. – 4:00 p.m. CT.

SPANISH (Español):       Para obtener asistencia en Español, llame al (800) 492-5678.
TAGALOG (Tagalog):      Kung kailangan ninyo ang tulong sa Tagalog tumawag sa (800) 492-5678.
CHINESE (中文):           如果需要中文的帮助，请拨打这个号码 (800) 492-5678.
NAVAJO (Dine):           Dinek'ehgo shika at'ohwol ninisingo, kwiijigo holne' (800) 492-5678.

000038
Walmart/Gaggos Statement of Position
7020200109043996

# EXHIBIT 8

000039
Walmart/Gaggos Statement of Position

10/31/2019 10:26:55 AM -0500 SEDGWICK                                   PAGE 3   OF 10

COMPLETE YOUR FORMS | MEDICAL INFORMATION

## Attending Physician Statement

**Associate name:** Joe R. Gaggos Jr          **Associate WIN:**
**Claim number:** 30193784202-0001           **Medical due date:** 11/20/2019

**SECTION 1: REQUIRED INFORMATION TO SUPPORT FMLA/STATE LEAVE**

1. Will the patient be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? Yes ☑  No ☐

   If yes, provide the beginning and ending dates for the period of incapacity: 10 /25/19 - 12/25/19

2. Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility? Yes ☐  No ☑  If yes, dates of admission: _____

3. Date(s) you treated the patient for condition: 10/25/19

4. Was medication, other than over-the-counter medication prescribed? Yes ☐  No ☑

5. Is the patient unable to perform any of his/her job functions due to their condition? Yes ☑  No ☐  If yes, identify the job functions the employee is unable to perform (use the list of the employee's essential functions or job description, if included, or answer this question based upon the patient's own description of his/her job functions)

   anxiety, labile blood pressure with dizziness

6. Describe other relevant medical facts, if any, related to the condition for which the patient seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment). NOTE: In California, Wisconsin and Connecticut, do not disclose the underlying diagnosis unless you have received consent from the patient.

   Recent Dxy OSA - hx s/p surgery to correct this w/ repeat sleep test with resolution of OSA, without mask.

**SECTION 2: REQUIRED INFORMATION TO SUPPORT DISABILITY BENEFITS**
NOTE: This information is required only to support a claim for disability benefits and is not required to support a leave request. Failure to provide this information will not affect the request for leave.

In order to verify that the patient cannot do their job, please provide written documentation of observable and measurable findings from examinations as well as supporting laboratory or diagnostic tests.

   see clinic note

1. Objective findings: HT:____ WT:____ BP:____ TEMP:____ PULSE:____ RESP:____

2. Patient's Complaints: fatigue, anxiety, weakness

Mcd 1 of 3

To: 18592644372                                                   From: 9797326596   11-01-19  11:28am  p. 1  of 9

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **
                                    30193784202000I
11-1-2019.   STATUS   PAGES   DURATION   REMOTE CSID                    TIME RECEIVED
              Received    9       416     9797326596                    November 1, 2019 10:52:23 PM EDT
                                                                        Walmart/Gaggos Jr-Statement of Position
                                                                        522019110I011671
                                                                        00001

10/31/2019 10:25:55 AM -0600 SEDGWICK                          PAGE 4   OF 10

**COMPLETE YOUR FORMS | MEDICAL INFORMATION**

Associate name: Joe R. Gaggos Jr               Associate WIN:
Claim number: 30193784202-0001                Medical due date: 11/20/2019

3. Your Diagnosis: (list all disabling diagnoses including all ICD10 codes)
   Primary:    ICD10 Code: _G47.33_   Description: _sleep apnea_
   Secondary:  ICD10 Code: _F41.1_    Description: _anxiety_
               ICD10 Code: _D64.3_    Description: _anemia_

4. List all co-morbid conditions: _____

_____

5. Is the medical condition pregnancy? Yes ☐  No ☑  If yes, expected delivery date: __/___/___

6. If patient is pregnant, is a C-Section planned? Yes ☐  No ☐  If yes, date scheduled? __/___/___

7. Describe objective/clinical findings to warrant disability, including severity and duration based on the patient's
   presentation during office visits. _____

   _____ _see previous page_ _____

8. Has the patient recovered sufficiently to return to work? Yes ☐  No ☑

   If "Yes", give the date the patient was able to return to work _12_/_25_/_19_
                                                                    BK

   If "No", in your opinion when, may work be resumed? (Please do not use "indefinite", "unknown",
   "undetermined", etc.) If a date cannot be determined, please estimate in days, weeks or months. _12_/_25_/_19_

9. Has the patient recovered sufficiently to return to restricted work? Yes ☐  No ☑
   If "Yes", indicate date restrictions begin: ___/___/___  Date restrictions end: ___/___/___
   Restriction (s) required: _____

   _____

10. When was patient first diagnosed with this condition? _5_/_10_/_18_

11. When is the patient's next office visit? ___/___/___  _Pending cardiology visit_

12. Is this condition the result of an injury? Yes ☐  No ☑  Is this condition work related? Yes ☐  No ☐
    If yes, provide date and description of event:

    _____

13. What is the prescribed treatment plan? (Please provide specific details regarding treatment/therapy, attach
    notes if necessary): ____ _anxiety and blood pressure medication, referral to cardiologist_

    _____

                                                            Med 2 of 3

                                                       000041
                                                      Walmart/Gaggos Statement of Position

11-1-2019                              301937842020001

10/31/2019 10:25:55 AM -0500 SEDGWICK                                    PAGE 5   OF 10

**COMPLETE YOUR FORMS | MEDICAL INFORMATION**

Associate name: Joe R. Gaggos Jr                    Associate WIN:
Claim number: 30193784202-0001                      Medical due date: 11/20/2019

14. List all medications, identify dates of new medications or dose adjustments: (attach list if necessary)

| Medication | Dose | Frequency | Duration | New Med | | Adjusted Med | Date Adjusted |
|---|---|---|---|---|---|---|---|
| | | | | Yes ☐ | No ☐ | Yes ☐ No ☐ | __/__/__ |
| | | | | Yes ☐ | No ☐ | Yes ☐ No ☐ | __/__/__ |
| | | | | Yes ☐ | No ☐ | Yes ☐ No ☐ | __/__/__ |
| | | | | Yes ☐ | No ☐ | Yes ☐ No ☐ | __/__/__ |

15. Has any surgical procedure related to current disability been performed or is any anticipated? Yes ☑ No ☐
   List the name of the procedure: _sleep apnea surgery of excess throat tissue_
   CPT code: _____  Date of procedure: _12/_12/_20 18_

16. Has patient been referred to other physician(s)/specialist? Yes ☑ No ☐ If yes, provide physician name, specialty,
   and telephone number. _Phillip Birkett - cardiology_

17. List specific functional limitations of Activities of Daily Living (ADL's): _____
   _fatigue, decreased focus_

18. Has patient been given any driving restrictions for this disability period? Yes ☑ No ☐
   If yes please describe: _no driving 7 1 hour at a time_

**Please attach all office notes, History & Physical, results of x-rays, laboratory tests, MRI Reports, etc, if relevant.**

The Genetic Information Nondiscrimination Act of 2008 (GINA) and the California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibit employers and other entities from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by applicable law. To comply with GINA and CalGINA, please DO NOT provide any genetic information when responding to this request for medical certification.

"Genetic Information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member of an embryo legally held by an individual or family member receiving assistive reproductive services. (75 Fed. Reg. 68934.)

"Genetic Information" as defined by CalGINA includes information about the individual's or the individual's family member's genetic tests, information regarding the manifestation of a disease or disorder in a family member of the individual, and includes information from genetic services or participation in clinical research that includes genetic services by an individual or any family member of the individual. "Genetic Information" does not include information about an individual's sex or age.

Telephone Number                     Healthcare Provider
                                     Name (Printed): _Bart Klaus_

Fax Number: _9797325795_             Healthcare Provider
                                     Specialty: _FP_

Date Completed: _10/31/19_           Healthcare Provider
                                     Signature: _____

                                                           Med 3 of 3

# EXHIBIT 9

April 16, 2020

# COMPANY LEAVE EXHAUSTION


sedgwick
caring counts

Joe R Gaggos Jr

Dear Joe:

At this time, you have been on an approved leave of absence, which will exhaust on 05/14/2020. Walmart's leave of absence policy allows up to 52 weeks away from work. There may be special circumstances that would allow a leave to extend beyond one year.

If you need more time away from work beyond 05/14/2020, please contact the Accommodation Service Center at 855-489-1600 to request an extension for a specific period of time or to assist you in returning to work. We will notify you and your facility of the decision.

*Here are some important details about your leave of absence request:*
- Leave case number: B910250204800725AA
- Leave exhaust date: 05/14/2020

*Here's what you need to do next:*
- If you will be requesting an extension beyond 12 months, refer to the attached insert and contact the Accommodation Service Center (ASC) at :
- If your request is not received before your approved end date, 05/14/2020, your leave will close.

*We are here to help:*
- Resources are available through mySedgwick and accessible at
- You can also contact the Walmart Disability and Leave Service Center at
  - Monday through Friday from 7:00 a.m. – 7:00 p.m. and
  - Saturdays 7:30 a.m. – 4:00 p.m. CT.

000044
Walmart/Gaggos Statement of Position
7020200416043827



**Have you exhausted your Medical Leave of Absence (MLOA)**

To request an extension, please call the Accommodation Service Center (ASC) at

**Associate name:** Joe Gaggos Jr

**Associate WIN:**

**Leave exhaust date: May 14, 2020**

**Leave case number: B910250204800725AA**

Under our Leave of Absence Policy, the most time you can take for medical leaves is 52 weeks. Under our Accommodation in Employment Policy, however, there are some situations where we can extend a leave.

If you're on a personal medical LOA approaching 52 weeks or your medical leave is otherwise used up, you can ask for a leave of absence extension as an accommodation.

*Here's what you need to do next:*

- To request an extension, please call the **Accommodation Service Center (ASC) at**

- Please make sure you have the following information available prior to submitting your request:
  - Your Physician's name and contact information
  - Your estimated return to work date
  - Details surrounding your accommodation request that may assist with getting you back to work
  - Any return to work plans that have been discussed with your facility

Once your request for an extension is received, the ASC will review your information. If additional information is needed, you will be contacted and a determination will be made regarding your request. If you have additional questions, please contact the ASC at                    Monday through Friday from 8:00 a.m. – 5:00 p.m.



4-16-2020                    301937842020001

000045
Walmart/Gaggos Statement of Position

7020200416043827

# EXHIBIT 10

| FIRST_NAME | LAST_NAME | TERMINATION_DATE | ACKNL_SUPVR_FIRST_NAME | ACKNL_SUPVR_LAST_NAME | TERMINATION |
|---|---|---|---|---|---|
| JOE | GAGGOS JR | 2020-05-15 | SOPHIE | ROBIN | Failure to Return fr |

7/8/2021                          FDA announces CPAP Recall, More – Millions of Devices Affected


**Matthews & Associates**
*Lawyers working for People*

---

Home // Matthews Legal News // FDA Alerts // FDA announces CPAP Recall, More

July 6, 2021

# FDA announces CPAP Recall, More

**Philips Respironics Ventilators, BiPAP, CPAP Machines recalled due to potential health risks**



## Philips CPAP Machine

On June 30, 2021, The U.S. Food and Drug Administration (FDA) announced it was alerting health care providers and people who use Philips Respironics ventilators, BiPAP, and CPAP machines that Philips Respironics has recalled certain devices (see below) due to potential health risks. The FDA said in a safety communication that polyester-based polyurethane (PE-PUR) sound abatement foam in these affected devices "may break down and potentially enter the device's air pathway. If this occurs, black debris from the foam or certain chemicals released into the device's air pathway may be inhaled or swallowed by the person using the device."

The agency said that those who use one of the affected devices should speak with a health care provider to decide on a suitable treatment for their condition and follow **the recommendations** the agency lists.

Philips Respironics is recalling the following affected devices manufactured between 2009 and April 26, 2021. For details, see **Philips' Respironics recall notification External Link Disclaimer** (PDF).

## CPAP and BiPAP Devices

| Device Type | Model Name and Number (All Serial Numbers) |
|---|---|

| Free Case Review | 📞  Call Now |
|---|---|

| | |
|---|---|
| Continuous Ventilator, Minimum Ventilatory Support, Facility Use | E30 (Emergency Use Authorization) |
| Continuous Ventilator, Non-life Supporting | DreamStation ASV<br>DreamStation ST, AVAPS<br>SystemOne ASV4<br>C-Series ASV<br>C-Series S/T and AVAPS<br>OmniLab Advanced+ |
| Noncontinuous Ventilator | SystemOne (Q-Series)<br>DreamStation<br>DreamStation Go<br>Dorma 400<br>Dorma 500<br>REMstar SE Auto |

# Ventilators

| Device Type | Model Name and Number (All Serial Numbers) |
|---|---|
| Continuous Ventilator | Trilogy 100<br>Trilogy 200<br>Garbin Plus, Aeris, LifeVent |
| Continuous Ventilator, Minimum Ventilatory Support, Facility Use | A-Series BiPAP Hybrid A30 (not marketed in US)<br>A-Series BiPAP V30 Auto |
| Continuous Ventilator, Non-life Supporting | A-Series BiPAP A40<br>A-Series BiPAP A30 |

**Recommendations for Caregivers and Users affected by BiPAP or CPAP Machines**

Free Case Review

  📞 Call Now

Stopping use of your device

Using another similar device which is not part of the recall

Using alternative treatments for sleep apnea, such as positional therapy or oral appliances that fit like a sports mouth guard or an

Using alternative treatments for sleep apnea, such as positional therapy or oral appliances that fit like a sports mouth guard or an orthodontic retainer.

Initiating long term therapies for sleep apnea, such as losing weight, avoiding alcohol, ceasing smoking, or even considering surgical options.

Continuing to use your affected device, if your health care provider determines the benefits outweigh risks identified in the recall notification.

**FDA further recommends that those concerned:**

Follow the manufacturer's instructions and recommended cleaning and replacement guidelines for your CPAP machine and accessories. Ozone cleaners may worsen the breakdown of the foam, and there are other potential risks associated with the use of ozone and ultraviolet (UV) light products for cleaning CPAP machines and accessories.

Register your device(s) on Philips Respironics' recall website External Link Disclaimer to stay informed of updates from Philips Respironics regarding any new instructions or other corrective fixes, which the FDA is requiring.

Report any problems with a device through the FDA's MedWatch Voluntary Reporting Form.

**FDA Recommendations for Caregivers and At-Home Users of Affected Ventilators**

FDA cautions ventilator users not to stop or change ventilator use until speaking with a health care provider.

Alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and in the judgment of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the potential risks identified in the recall notification.

Talk to your health care provider about using an inline bacterial filter, which may help to filter out particles of foam, as indicated in the Philips recall notification. At this time, the FDA does not have evidence of the safety and effectiveness of a filter for mitigating the foam risks, and the FDA's evaluation is ongoing.

**FDA also announces it is important to note the following considerations:**

FDA announces CPAP Recall, More – Millions of Devices Affected

Free Case Review                                    📞  Call Now

Filters may affect ventilator performance because they may increase resistance of air flow through the device.

Users should closely monitor for possible accumulation of foam debris on the filter or resistance-related problems in the breathing circuit after filter placement.

## Description of the Philips' Devices

These devices are used to provide breathing assistance. Specifically:

A bilevel positive airway pressure (also known as **BiPAP**, **BiLevel PAP**, or **BPAP**) machine pumps air under pressure into the airway of the lungs. BiPAP machines have a higher pressure when you breathe in and lower pressure when you breathe out.

A continuous positive airway pressure (**CPAP**) machine keeps your airway open by providing a continuous stream of air through a mask. CPAP machines are devices prescribed to people with obstructive sleep apnea to keep their airways open during sleep.

A continuous **ventilator** device is intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas.

## PE-PUR Foam May Be Inhaled or Swallowed, Presenting a Potential Health Risk

Polyester-based polyurethane (PE-PUR) is a sound abatement foam used to reduce sound and vibration in these devices and other medical equipment. The PE-PUR foam in the affected Philips Respironics CPAP, BiPAP, and ventilator devices may break down (degrade) into particles which may enter the device's air pathway and be inhaled or swallowed by the user, and release certain chemicals into the device's air pathway, which may be inhaled. These issues can result in serious, even life-threatening injury; cause permanent impairment; require medical intervention to prevent permanent damage.

## Complaints over Debris to Philips Respironics

Philips Respironics has, to date, received several complaints about the presence of black debris/particles within the device's air pathway. Philips Respironics has also received reports of headache, upper airway irritation, cough, chest pressure, and sinus infection, which may be related to this issue, though the cause of the symptoms cannot be definitively linked.

## Potential Risks, Injuries

The potential risks of particulate exposure include irritation to the skin, eye, and respiratory tract, inflammatory response, headache, asthma, and toxic or carcinogenic

Free Case Review                                                      📞  Call Now

the PE-PUR foam include:

> headache;
> dizziness
> irritation in the eyes, nose, respiratory tract, skin
> hypersensitivity
> nausea/vomiting
> toxic and carcinogenic effects.

The foam degradation may be worsened by high heat and high humidity environments, and by the use of unapproved cleaning methods such as ozone. To date, there have been no death has been reported as a result of these issues.

## FDA Actions

The FDA is working with Philips Respironics to evaluate the issue, the scope of the recall, and the most appropriate mitigation strategies, including corrective actions by Philips.

The FDA says it is analyzing medical device reports (MDRs) related to the affected devices over the period of 2009-2021 for reports that could be related to this issue.

The FDA also says it does not currently have evidence that any other CPAP machines, BiPAP machines, or ventilators – whether from Philips or other manufacturers — are affected.

The FDA further reports that it will continue to monitor supply and demand to assess availability of the affected devices and any potential shortages, and will update the public as it learns more.

## Reporting Problems with Your Device

FDA encourages those who think they may have a problem with a CPAP, BiPAP, or mechanical ventilator, to report the problem through the **MedWatch Voluntary Reporting Form.**

## Questions re: Medical Device Recalls?

FDA notes that those who want more information regarding medical device recalls – including **What is a Medical Device Recall? —** can find more information at FDA.gov.

## RELATED

**Philips CPAP Recall Lawsuit**
**Dangerous Medical Devices not tested**
**FDA recalls 21 Medical Devices so far in 2021**

FDA announces CPAP Recall, More – Millions of Devices Affected

| Free Case Review |
|---|

📞  Call Now

by Matthews & Associates

$3.3 Million Jury Award in Wisconsin IVC ...

---

# Free Case Evaluation

**Name \***

**Phone \***

**Email \***

**How can we help you?**

**CAPTCHA**

*WU 5 DZ*

Please enter the letters and number above
to prove you're human.

Free Case Review

📞 Call Now

## Blog Articles by Category

Select Category ⌄

## Related Articles



*May 15, 2021*
Hand Sanitizers recalled for Methanol



*April 5, 2021*
Plumbers' Union fights to reinstate Zantac Claims



*February 11, 2021*
Baby Foods contain Toxic Heavy Metals. FDA failed to warn of risk.



*January 22, 2021*
Monsanto pesticide continues to poison millions



*January 12, 2021*
Zantac Defendants claim FDA Relationship Protects them from Liability



*December 11, 2020*
FDA-approved Drugs Kill 100,000+ yearly

Free Case Review     📞 Call Now

 Zantac Cancer Lawsuits Update – November 2020

*September 2, 2020*

 Monsanto Appeals Verdict in First Roundup Trial

*April 7, 2020*

How does Cancer Threat Belviq get FDA approval?

*January 14, 2020*

 Monsanto Cancer Victims include Children in 2020 Trials as Glyphosate Ruse Continues








7/8/2021                              FDA announces CPAP Recall, More – Millions of Devices Affected

| Free Case Review | 📞 Call Now |



## Lawyers
## for People

## Offices

Houston, TX*

New York, NY*

Chico, CA*

Salinas, CA*

*by appt. only

## Connect with Us

f  Facebook

🐦 Twitter

in  LinkedIn

▶ Youtube

## Contact

**1-888-520-5202**

local: 713-522-5250

email us

---

**Please note:**
This information does not create an attorney-client relationship. Such a relationship is created only after you sign a contract and we accept you as a client. Material contained here may not apply to your own circumstances. Online readers should not act on this information without seeking professional counsel.

© Copyright 2021  Matthews and Associates | 2905 Sackett Street | Houston, Texas | 77098

f  Facebook

🐦 Twitter

in  LinkedIn

▶ Youtube

7/11/19 *qfl* B48

Form **SSA-521** (11-2018) UF
Discontinue Prior Editions
Social Security Administration

TOE 420

Page 1 of 2
OMB No. 0960-0015

# REQUEST FOR WITHDRAWAL OF APPLICATION

Do not write in this space

IMPORTANT NOTICE - This is a request to withdraw your application. If we approve it, the decision we made on your application will have no legal effect. You will forfeit all rights attached to an application, including the rights of appeal. You will have to return any payment we made to you or anyone else on the basis of that application. You must then reapply if you want a determination of your Social Security rights at any time in the future. Any subsequent application may not involve the same retroactive period. We intend for you to use this procedure only when your decision to file has resulted, or will result, in a disadvantage to you. Your local Social Security office will be glad to explain whether, and how, this procedure will help you.

NAME OF WAGE EARNER, SELF-EMPLOYED INDIVIDUAL, OR ELIGIBLE INDIVIDUAL     Joe R Gascos JR

SOCIAL SECURITY NUMBER     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

IF DIFFERENT, PRINT YOUR NAME (First name, middle initial, last name)

YOUR SOCIAL SECURITY NUMBER

TYPE OF BENEFIT YOU WANT TO WITHDRAW     Social Security Ret.

DATE OF APPLICATION     01-03-2019

IF APPLICABLE, DO YOU WANT TO KEEP MEDICARE BENEFITS? ☐ Yes ☑ No  N/A

I hereby request the withdrawal of my application, dated as above, for the reasons stated below. I understand that (1) this request may not be cancelled after 60 days from the mailing of notice of approval; and (2) if a determination of my entitlement has been made, there must be repayment of all benefits paid on the application I want withdrawn, and all other persons whose benefits would be affected must consent to this withdrawal. I further understand that the application withdrawn and all related material will remain a part of the records of the Social Security Administration and that this withdrawal will not affect the proper crediting of wages or self-employment income to my Social Security earnings record.

Give reason for withdrawal.  (If you need more space, use the reverse of this form.)

1. ☐ I intend to continue working. (I have been advised of the alternatives to withdrawal for applicants under full retirement age and still wish to withdraw my application.)

2. ☑ Other (Please explain fully): Had surgery Surgery on 11-12-2018 for sleep apnea, complete recovery, returned to work on 7-8-2019

☐ Continued on reverse

## SIGNATURE OF PERSON MAKING REQUEST

Signature (First name, middle initial, last name) (Write in ink)

SIGN HERE  X  Joe R Gascos Jr

Date (Month, day, year)  07-11-2019

Telephone Number (include area code)  713-554-3444

Mailing Address (Number and Street, Apt. No., P.O. Box, or Rural Route)  1590 H. Rt2 Rd

City and State  Sealy  TX

ZIP Code  77474

Enter Name of County (if any) in which you now live  Austin

Witnesses are required ONLY if this request has been signed by mark (X) above.  If signed by mark (X), two witnesses to the signing who know the person making the request must sign below, giving their full addresses.

1. Signature of Witness

2. Signature of Witness

Address (Number and Street, City, State and ZIP Code)

Address (Number and Street, City, State and ZIP Code)

## FOR USE OF SOCIAL SECURITY ADMINISTRATION

☐ APPROVED     ☐ NOT APPROVED BECAUSE     ☐ BENEFITS NOT REPAID     ☐ CONSENT(S) NOT OBTAINED     ☐ OTHER (Attach special determination)

SIGNATURE OF SSA EMPLOYEE

TITLE  ☐ CLAIMS AUTHORIZER

☐ OTHER (Specify)

DATE



# Columbus - ENT

109 SHULT DR    STE 200
COLUMBUS TX 78934-3015
Ph: 979-680-8808  Fax:

## Release To School Work Form

NAME: Joe Gaggos                                          DATE: 08/14/2018

ADDRESS: 1590 Hintz Road  Sealy TX 77474

☑ Patient was seen in our office today for a scheduled appointment

Diagnosis: Obstructive sleep apnea

Release to: work                    ♥ on 8/21/2018

Restrictions:

☑ No restrictions              ☐ No running                              ☐ No contact sports
☐ No jumping
☐ No lifting
☐ No overhead work             ☐ Right ☐ Left
☐ Right-hand work only         ☐ Left-hand work only
☐ No repetitive bending        ☐ No repetitive stooping
☐ No continual standing        ☐ No continual walking        ☐ No continual stair climbing
☐ No prolonged sitting
☐ No climbing
☐ Sedentary Only
☐ No lower body                ☐ No upper body
☐ No pivoting                  ☐ No twisting movements
☐ Other

Instructions:

May return to work without restrictions. Call 979-680-8808 with any questions or concerns

May return to work on the 21st without CPAP machine. Corrected
sleep apnea with surgery.

Recheck Visit: |                                ♥

_Jared Hough_

Physician's Signature              PA's Signature              08/14/2018
                                                               Date

Powered By eClinicalWorks LLC.

Jared Hough, PA - Symmentra Hutton, MA


1st surgery release to return to work
with out CPAP

_Joe Sgr_
4-5-2021

Sent June 12, 2019 via email by Ron Voight office manager transportation sealy, texas DC7036 and confirmed

To Jeff Hammond, Kevin, and Roxie:

My name is Joe Gaggos and I am a truck driver for Walmart. I have driven for Walmart for 14 years. I started in Porterville, California and worked there for 5 years. When Walmart opened in Sealy, Texas in 2005 I transferred there and was part of the start up crew as a set run driver. After 14 years working for Walmart I am no longer sure about what my position is with the company. I have been battling with health and policy issues and all I want is to resolve them so I can start working again.

On April 31, 2018 I took a CPAP sleep apnea test for Walmart. I had to take the apnea test because I was overweight and had high blood pressure. I weighed 290 pounds and had a neck thickness if 18 inches. I scored a 15.2 on the apnea test so they advised that I use a sleep apnea machine at night. That is when my real problems began.

On May 1, 2018 I was sent home to use the apnea machine for the first night. I was not given any instructions on how to use the device. They simply told me to open the box and follow the instructions that were included. They did not even fit the mask to my face. I had surgery to remove a portion of my nose due to skin cancer. It kept the mask from fitting properly. This caused air to be forced into my right eye and the next day I woke up with a red, irritate, and very dry eye. I tried different things to help the mask fit and seal properly, such as filling the gap with tissue paper and other materials, but nothing worked. The eye irritation continued and worsened to the point where I began to lose vision in my right eye.

I called Sleep Safe, the company that provided the machine numerous times. I also contacted the safety manager at Walmart. I complained about the issues I was having and tried to get someone to help me correct the situation. They all just told me I had to get used to the machine. It wasn't until after I was already removed from work that Sleep Safe finally recommended that I come in to have a mask fitting, and this was after 2 weeks of trying to use the machine. I went and did the fitting and there was still no improvement. I continued trying to use the machine for 30 more days.

With no improvement I called Sleep Safe again. They were rude and belligerent. I asked to talk to the representative's boss and was connected. Instead of being met with concern and assistance I was met with hostility and neglect, they refused to listen or offer assistance with the issues. Instead he emailed my safety manager to report that I was having issues using the machine. I contacted my safety manager and he informed me that Sleep Safe said that, "I need to grow up and get used to it." Both said that their hands were tied and there was nothing they could do about the situation. I was told that if I did not continue to use the machine despite the issues I was having I would be kept off work.

On June 14, 2018 I had a DOT physical. I failed the physical because of the loss of vision in my right eye that was caused by the CPAP machine. I was again taken out of work until I got glasses to improve my vision. I had never before needed glasses. The eye doctor, Dr. Griffith, informed me that the eye damage was irreversible and that I would now wear glasses permanently.

I was then sent to and ear, nose and throat specialist, Dr. Salzer, that recommended I get surgery to correct the sleep apnea so that I would not have to use the machine anymore. I underwent surgery on July 26, 2018. I had to have a tonsillectomy, adenoidectomy, and nasal turbinate reduction. They also shaved off some of the back of my tongue and removed excess skin and tissue in an attempt to open up my throat so that the sleep apnea would be cured.

Sent June 12, 2019 via email by Ron Voight office manager transportation sealy, texas DC7036 and confirmed

The doctor released me to return to work on August 21, 2018 without use of the sleep apnea machine. However, Walmart refused my doctor's recommendation and insisted that I get cleared by their doctor. On August 24, 2018 I underwent another sleep study. Due to the swelling that was still present from mu surgery the month before I scored a 32 and was removed from work yet again.

On September 13, 2018 I went to an orthodontic surgeon, Dr. Maids, for a 3D cone beam evaluation. They discovered that I only had 5 centimeters of clearance in the back of my throat. They decided on another surgery to improve the clearance. On November 12, 2018 I underwent a very complex surgery. I had maxillomandibular advancement surgery, bilateral sagittal splint osteotomy, advancement via Lefort 1 osteotomy, and placement of maxillary and mandibular archbars. Basically, they broke my jaw, cut my gums and moved my teeth and jaw forward 1 centimeter.

I was in the hospital for 4 days. My mouth was wired shut and my face was swollen beyond recognition. I had to remain on a liquid diet for 2 months. I had to learn to chew and talk again, without any therapy. After 6 months I was able to begin to eat normally. In that time I lost 85 pounds and my neck size reduced to 16 inches. I am currently 205 pounds, but I have 20 pounds of extra skin that must be removed surgically. Due to the weight loss I was able to discontinue most of my medications. I no longer have to take blood pressure medications and I am being weaned off of thyroid and testosterone medications. On November 20, 2018 I received another 3D cone beam evaluation that showed the clearance was 19 centimeters and this clearance has continued to increase as I heal from the surgery. I was again realeased to go back to work on April 18, 2019.

However, Walmart safety manager and Human Resources contacted me on April 14, 2019 just days before I was set to return and informed me that they did not know what they were going to do with me yet. They eventually decided that I had to undergo another DOT physical in order to return to work.

On May 6, 2019 I passed my DOT physical and the DOT cleared me for 2 years. Because of the weight loss and surgeries they determined I did not need to use the sleep apnea machine. Walmart decided they would not allow me to come back to work without using the machine.

I had another sleep test on May 31, 2019 and they failed me for a score of 14. However the report indicated that I did not have any of the sleep apnea markers. The only reason I was failed was because I scored 1 point for hypotenia, which is shallow breathing. The other results such as my sleep efficiency I scored 90%, my oxygen level was 94%, and my pulse was 59. The doctor determined these were all normal scores for a sleeping person.

After some research on sleep apnea I have discovered that there is a therapeutic option called V myofunctiono therapy that has a 40% success rate at reducing sleep apnea. This therapy used exercise to strengthen the throat and neck muscles. This option was not discussed with me before making me get two intense and possibly unnecessary surgeries. And still with the 2 surgeries and multiple doctors giving me clearance Walmart will not let me return to work without using the apnea machine that has already caused me more damage.

On June 9, 2019 I was told that I could return to work without the machine. 2 hours later I was called and told that I was put on standby again. This battle has been going on for over a year. I have not received unemployment because they said that Walmart fired me for medical reasons. Walmart claims

Sent June 12, 2019 via email by Ron Voight office manager transportation sealy, texas DC7036 and confirmed

that I am still on the books. DOT examiners and other doctors have cleared me, but Walmart will not let me return because their doctor will not clear me to return without the machine. I refuse to use the machine that has already caused irreversible damage to my eye and vision. Even though I passed the DOT exam, they said Walmart has its own policies. They are having issues with their policy and procedures and it is costing me time and money. I would like an independent party to analyze my results to determine if I can be cleared to work without the machine. I am being treated unfairly and I cannot allow this to continue. All I want to do is return to work without using this machine that I do not even need.

Sent June 12, 2019 via email by Ron Voight office manager transportation sealy, texas DC7036 and confirmed

Contacts and References

US Department of Labor. Case Number: 29crf1977

Department of Emploment. Case Number: 06-442047-0

Blake D Maids, DDS

Dr Florence Dupleix Griffith, OD

Barth Klaus, MD

Todd Swick, MD, FAASM.

Raymond Thomas, DOT

Sleep Safe Drivers

E Screen

Sedgwick

My name is Joe Gaggos, I have been a truck driver for Walmart for 20 years. I was diagnosed with sleep apnea and forced to use a CPAP machine. From the first use I knew something was wrong. I reached out to Sleep Safe and Walmart safety managers but everyone refused to help me. They told me to "Suck it up and get used to the machine." I underwent life altering surgery and still was refused work due to company policy. I have been battling with Walmart, unemployment, social security, and my insurance was lost. I'm reaching out to you today to try to get my story out there. It has created a life of turmoil and anxiety for me. I know there are other drivers suffering like I am. Walmart policy is also creating a public safety issue for its employees and citizens that are on the road with Walmart drivers.

I was sent home to use the apnea machine for the first night. I was not given any instructions on how to use the device. They simply told me to open the box and follow the instructions that were included. They did not even fit the mask to my face. I had surgery to remove a portion of my nose due to skin cancer. It kept the mask from fitting properly. This caused air to be forced into my right eye and the next day I woke up with a red, irritated, and very dry eye. I tried different things to help the mask fit and seal properly, such as filling the gap with tissue paper and other materials, but nothing worked. The eye irritation continued and worsened to the point where I began to lose vision in my right eye. After seeing an eye doctor it was discovered that my eye is now permanently damaged and I will have to wear glasses for the rest of my life.

Walmart is supposed to have an open door policy with regards to issues and complaints. However, since the beginning of this sleep apnea issue I have had the door shut and slammed in my face. I have tried to contact all the way to the V.P of Walmart and have been stonewalled. It took 2 weeks for Sleep Safe to have me come for a fitting. The machine was still not working properly for me. I was told by the Walmart Safety manager that I could not contact Sleep Safe directly anymore that I had to go through them. I have reached out to them multiple times and still not gotten help. I was told that I had to use the machine or they would have to keep me off work.

A specialist recommended having surgery to fix the issues that were causing apnea so that I would not even have to use the machine anymore. I had to have a tonsillectomy, adenoidectomy, and nasal turbinate reduction. They also shaved off some of the back of my tongue and removed excess skin and tissue in an attempt to open up my throat so that the sleep apnea would be cured. I had maxillomandibular advancement surgery, bilateral sagittal splint osteotomy, advancement via Lefort 1 osteotomy, and placement of maxillary and mandibular archbars. Basically, they broke my jaw, cut my gums and moved my teeth and jaw forward 1 centimeter. I was in the hospital for 4 days. My mouth was wired shut and my face was swollen beyond recognition. I had to remain on a liquid diet for 2 months. I had to learn to chew and talk again, without any therapy. After 6 months I was able to begin to eat normally. In that time I lost 85 pounds and my neck size reduced to 16 inches. I am currently 205 pounds, but I have 20 pounds of extra skin that must be removed surgically. Due to the weight loss I was able to discontinue most of my medications. I no longer have to take blood pressure medications and I am being weaned off of thyroid and testosterone medications.

Despite receiving normal scores and approvals from my doctors, the Walmart DOT doctor, and the Texas Medical Board, Walmart still refused to let me go back to work without using the CPAP machine that I don't even need. They refuse the results and advice from my doctors claiming that I am just Doctor shopping. I underwent another sleep study on. This was the first sleep study that they used a BPAP machine and adjusted it while I was there. During the course of the study they had to experiment with

different masks and setting to try to get it functioning properly for me. They discovered that I breathe with my mouth open, and this prevents the machine from providing me with the proper amount of oxygen. I received a review that gave me recommendations for the BPAP machine and setting that would benefit me the most. I was given an ultimatum, continue to use the machine or be prevented from working. I continued to try to use the machine, despite still having issues, so that I could continue working. I have applied to 20 other jobs but the ruling from Walmart about having to use the machine has black listed me from driving with other companies.

I have been dealing with this ordeal since April 2018. This whole situation has given me stress, depression, and anxiety. My body has been permanently altered and I am still having issues with excess skin and my teeth and jaw is sore and affects my ability to eat. I am blacklisted from doing the job I love. I already have an EEOC case submitted for discrimination against my age and disability. I also have a lawyer working on my case. I can provide all documents from my doctors, psychologist, DOT, and Texas Medical Board. I just really want the public to know what is going on. There are other drivers like me that are being forced to use these machines. It is dangerous to our bodies and minds. That affects our abilities to drive which can cause accidents hurting innocent people. All because Walmart wants to force a policy despite doctor recommendations. Something needs to be done and I'm willing to fight that fight, but I need someone that can help me get this information spread so that the public can be aware.



**U.S. Equal Employment Opportunity Commission**
**Houston District Office**   Mickey Leland Building
1919 Smith Street, 7th Floor
Houston,TX,77002
(346) 327-7748
TTY (800) 669-6820
Fax: (713) 651-4902

## CONFIDENTIALITY AGREEMENT

EEOC NUMBER: 493-2021-00381

*1. I agree to participate voluntarily in mediation in an effort to resolve the charge(s) filed with the EEOC.*

*2. I agree that all matters discussed during the mediation are confidential, unless otherwise discoverable, and cannot be used as evidence in any subsequent administrative or judicial proceeding. Confidentiality, however, will not extend to threats of imminent physical harm or incidents of actual violence that occur during the mediation.*

*3. Any communications between the ADR Coordinator and the mediator(s) and/or the parties are considered dispute resolution communications with a neutral and will be kept confidential.*

*4. I agree not to subpoena the mediator(s) or compel the mediator(s) to produce any documents provided by a party in any pending or future administrative or judicial proceeding. The mediator(s) will not voluntarily testify on behalf of a party in any pending or future administrative or judicial proceeding. The parties further agree that the mediator(s) will be held harmless for any claim arising from the mediation process.*

*5. Mediation sessions will not be tape-recorded or transcribed by the EEOC, the mediator or any of the participants. All information including all notes, records, or documents generated during the course of the mediation shall be destroyed at the conclusion of the session. Parties or their representatives are not prohibited from retaining their own notes. However, EEOC will not maintain any such notes or records as part of its record keeping procedures.*

*6. If a settlement is reached by all the parties, the agreement shall be reduced to writing and when signed shall be binding upon all parties to the agreement. If the charge(s) is not resolved through mediation, it is understood by the parties that the charge(s) will be transferred to the investigative unit for further processing.*

Signed digitally by Joe Gaggos                    03-13-2021 08:46 AM EST

Charging Party                                             Date
Mr. Joe R Gaggos Jr.



**U.S. Equal Employment Opportunity Commission**
**Houston District Office**
Mickey Leland Building
1919 Smith Street, 7th Floor
Houston,TX,77002
(346) 327-7748
TTY (800) 669-6820
Fax: (713) 651-4902

### AGREEMENT TO MEDIATE

CHARGE NUMBER: 493-2021-00381
FEPA NUMBER:

Charging Party: Mr. Joe R Gaggos Jr.
Respondent: WALMART

This is an agreement by the above parties to participate in mediation in the above referenced charge. The parties understand that mediation is a voluntary process, which may be terminated at any time. The parties and, if they desire, their representatives and/or attorneys, are invited to attend a mediation session. No one else may attend without the permission of the parties and the consent of the mediator(s).

The mediator(s) will not function as the representative of either party. However, the mediator(s) may assist the parties in crafting a settlement agreement. Each party acknowledges being advised to seek independent legal review prior to signing any settlement agreement. The parties acknowledge that they have received a copy of the Mediation Fact Sheet. The parties acknowledge that the mediator(s) possesses the discretion to terminate the mediation at any time if an impasse occurs or either party or the mediator deems the case inappropriate for mediation.

The parties acknowledge that participation in the scheduled mediation does not constitute an admission by either party of any wrongdoing or of a violation of the laws enforced by EEOC. Furthermore, the Charging Party acknowledges that participation in the scheduled mediation by the Respondent does not commit the Respondent to providing a monetary resolution of the matter.

The parties recognize that mediation is a confidential process and agree to abide by the terms of the attached Confidentiality Agreement. The parties acknowledge that if a settlement is reached as a result of the mediation, the assigned mediator(s) is required to report to EEOC any benefits received. This information is reported only for purposes of providing aggregate data to the EEOC for mediation program evaluation purposes, and the individual terms of the agreement will not be disclosed to the public.

Signed digitally by Joe Gaggos                    03-13-2021 08:46 AM EST

Charging Party                                                              Date
Mr. Joe R Gaggos Jr.
Phone: (713) 594-3444/ Cell Phone:(713) 594-3444



# Burditt honored with certificate

CONTRIBUTED REPORT

Tony Burditt of Sealy accepted an invitation of lifetime membership in The National Society of Collegiate Scholars (NSCS), the nation's leading certified honor society for high-achieving first- and second-year college students with a minimum 3.4 grade point average.

NSCS is an honors organization that invites less than 10% of all eligible students nationwide to join the ranks of its diverse membership each year. A leading interdisciplinary academic honor society, NSCS is made up of scholars from two-year and four-year and online institutions.

"We welcome Tony Burditt to our community of like-minded, high-achieving nationwide scholars," said Scott Mobley, NSCS executive director.

Founded in 1994 by veteran student affairs professional Stephen Loflin, NSCS continues to remain true to its promise of recognizing, elevating, and connecting high achievers. With a portfolio of exclusive benefits that include access to over $1 million in scholarships, chapter funds, and awards annually, professional development resources, exclusive tailored content, and leadership and service experiences, NSCS is poised to support member growth and development throughout their academic and collegiate journey.

"NSCS is more than just a symbol of academic achievement; it's a distinction of honor," Mobley said. "Our scholars are some of the best of the best who have shown an unwavering commitment to academic excellence early in their collegiate journey. These dynamic individuals embody the NSCS pillars of scholarship, leadership, and service, and many go on to become active contributors in their respective fields."

Joe Brantham

Tony Burditt of Sealy holds his certificate of membership in the National Society of Collegiate Scholars.

# Sealy earns highest score at regionals

Photo courtesy Sealy High School

The Sealy High School marching band earned the highest score possible Nov. 17 at the Regional marching contest at Waller High School. It was the first time since 2004 the band earned straight 1s, and the band was also honored with a sweepstakes trophy.

The Roaring Band from High from was awarded straight 1s for their performance at the Regional marching contest Nov. 17 at Waller High School. The band and band members, earned a trip to the state competition on the line.

## BREATH

from page 1

vision in my right eye," he said.

He made numerous calls to Sleep Safe, the company that provided the CPAP machine, before they finally checked and discovered that the dehumidifier had not been turned on. Coggins also made calls to the safety manager at the Sealy Walmart Distribution Center and was told he would just have to get used to the machine. After two weeks, he was finally given a mask fitting, but to no avail. His problems continued.

In June of 2019 he took a Department of Transportation physical and failed due to vision loss.

"The eye doctor informed me that the eye damage was irreversible and that I would now wear glasses permanently," Coggins said.

He also went to an ear, nose and throat specialist who recommended surgery so he would no longer need the CPAP. That took place on July 26.

"I had to have a tonsillectomy, adenoidectomy, and nasal turbinate reduction," he said. "They also shaved off some of the back of my tongue and removed excess skin and tissue in an attempt to open up my throat so that the sleep apnea would be cured."

On Aug. 21 he was released to go back to work by his doctor, but Walmart wanted another sleep study before he could drive again. Coggins said he still had swelling from the surgery and ended up failing the study.

A month later Coggins saw an orthodontic surgeon who discovered that he had only two centimeters clearance in the back of his throat. On Dec. 12, 2019, Coggins was again under the knife.

"Basically, they broke my jaw, cut my gums and moved my teeth and jaw forward one centimeter," he said.

His mouth was wired shut in recovery and he was on a liquid diet for two months. It took six months before he could eat normally again. By then he had shed 86 of the 190 pounds he would eventually lose.

"I had to learn to chew and talk again without any there[?]," he said.

The surgery worked and his throat opened to 10 centimeters. With his weight loss he was able to come off several medications, including ones for high blood pressure.

"I was again released to go back to work on April 18, 2020," he said.

Before Walmart would let him drive, however, they wanted him to undergo another DOT physical. On May 6 he took the physical and was cleared by the DOT for two years and he was not required to use the sleep apnea machine.

"Walmart decided they would not allow me to return without using the machine," Coggins said.

On May 31 Coggins took another sleep test and failed.

"The report indicated I did not have any of the sleep apnea markers," he said. "The only reason I failed was because I scored one point for hypopnea, which is shallow breathing."

It turns out that Coggins breathes through his mouth, which was discovered when he had another sleep study done on June 30, 2019. This time doctors used a BPAP machine, similar to a CPAP.

"An $8 strap would have solved the problem," he said, noting the strap around his head keeps his mouth closed and forces him to breathe through his nose.

"Despite receiving normal scores and approvals from my doctors and the Walmart DOT doctor, Walmart still refused to let me go back to work without using the CPAP machine that I don't even need," he said.

Coggins agreed to continue to use the machine and returned to work. He continued to have problems with the CPAP, only this time he had developed anxiety and confusion related to it. Over the next few months he brought Walmart letters from doctors stating that his breathing was fine and that he suffered from an intolerance to the CPAP and BPAP machines.

By December of 2019 Coggins was suffering from so much stress and anxiety over use of the machines that he approached his supervisors to file for worker's compensation. His claim was denied.

When contacted by The Sealy News, the Walmart Distribution Center referred questions to the company's corporate communications office.

"We take being one of the safest fleets seriously, and our drivers must meet some of the highest safety standards in the industry. This includes complying with all applicable Department Of Transportation (DOT) policies and procedures and passing DOT physicals and sleep studies using approved physicians. Unfortunately Mr. Coggins was unable to comply with DOT regulations, he chose not to file an extension at the end of an extended leave and was separated from the company. We wish him well," Robyn Babbitt, Director of Corporate Communications, said in a statement.

Coggins has been seeing a therapist and is trying to get his anxiety under control. In the meantime he is on disability and feels he will never work again as a truck driver.

"At the very least I hope this makes Sleep Safe try harder to understand that patients are unique and need extra help and evaluations to prevent issues like the ones I have been fighting," he said. "I also hope that my struggle will cause Walmart to evaluate cases like mine on a case by case basis instead of their rigid stance on a policy that is one size fits all. I just want to be helped dealing with the situation and for someone to accept responsibility and make this right."

SEALY KC'S Famous FISH FRY
FRIDAY December 11th
Percentage of Net Proceeds $10
will go toward Sealy Wreaths

Well, it works...

Edgewood Apartment Homes
1001 Hwy 90 W • Sealy, TX • (979) 885-7173

040 AUCTIONS

BID ONLINE NOW
Farm, Ranch & Construction
Equipment Auction
Sat, Dec 12 at 10:00 AM
1036 S. FM 331, Sealy, TX
Accepting Consignments
M-F 8-5, 12/5 8-5 & 12/6 1-5
Start bidding now at
www.switzerauction.net
Consignments from Austin County
Precinct 1 and Austin County
10% BP on items $2,500 & less TXS#7342
www.switzerauction.net (979) 885-2400

060 GARAGE SALES

MOVING SALE IN Frydek. 9392 FM 1458 (Next to VFD). Fri. Dec. 4 & Sat. Dec. 5, 8-4 Furniture, china, silverware, household items, clothing, yard décor, plants & lots more.

210 MISC. SERVICES

HOUSE LEVELING AND foundation repairs. Slabs – Piers and beams, replace rotten sills and wood. 40 years experience Free estimates Mobile Home leveling. 281-232-6268.

610 FARMS, RANCHES

LANDOWNER LOOKING FOR someone to go in raising watermelons on a percentage. 11 acres in Sealy. Call 979-257-9292.

620 HOUSES FOR SALE

2,000 SQ FT, 4-bedroom, 3 bath, fireplace, kitchen island, granite downstairs bar located in quiet neighborhood in Crystal Beach, Tx by School. For more information, call 936-488-1314.

620 HOUSES FOR SALE

OWNER FINANCE, YOU pick home, we buy & finance to you, fixed rate 15-20% down; No credit check, loan application, tax returns, social security; foreign national ok, Richard (281) 546-4646

660 COMMERCIAL PROPERTY FOR RENT

FOR RENT
Mini Warehouses
Size 10x20
Contact Bill's Supermarket
885-3522

WAREHOUSE
S&H Mini Warehouses
Size 10 x 20
$60 per month
979-885-0700

660 COMMERCIAL PROPERTY FOR RENT

WAREHOUSE FOR RENT: 9020 NW I10 frontage road, Sealy 50X30x10, 2 sliding 11' doors, concrete floors, utilities. $800/mo +deposit with contract. Call 832-628-5933 or email Omeja66@yahoo com

700 HOUSES FOR RENT OR LEASE

3 BEDROOM 2 bath house for rent – Sealy. Call 979-472-8932.

MOVE-IN SPECIAL; REMODELED Townhomes - New Owner & New Mgrs.: 2&3 Bedroom, Covered Parking; Agent 281-578-2888

SPACIOUS 2 BD. 1 bath w/ washer & Dryer hook up. New laminate floors and fresh paint. $250 Sec. Deposit with good credit/ rental history. $729 / month + Utilities. Please call (832)437-0471.

FOR RENT 3BR/2BATH Mobile Home remodeled, beautiful, storage shed, big porch. Wallis 713-301-9420.

3 BR/2 B HOMES FOR RENT IN A VERY NICE COMMUNITY. PLEASE GIVE US A CALL AT 979-885-1888.

730 RV/MOBILE HOME LOTS FOR RENT

RV LOTS AVAILABLE for rent. Spacious lots, peaceful and quiet community 979-885-1888.

PUBLISHER'S NOTICE

850 HELP W...

HELP W... - All p... cooks, ...nance, ... shiers. A... person at ... Korner, 9... I-10 Fron... Sealy. ... 6077

SUPER... TEL: No... front de... time. C... 564-5201

HOUSE... ER ... Large ... home. ... reference... area – ... 1574.

620 HOUSES FOR SALE | 620 HOUSES FOR SALE | 620 HOUSES FOR SALE

Travis Abel & Associates
Real Estate
Travis Abel Broker 281-352-4119
Diana Abel Broker 281-352-4593
Associate 713-252-2703
720 N. Meyer, Sealy | 979-885-3524
MLS Residential • Farms • Ranches • Commercial

900 BUSINESS OPPORTUNITIES | 900 BUSINESS OPPORTUNITIES | 900 BUSINESS OPPORTUNITIES

SOUTHERN
sealynews.com

...conomic Development
...Executive Director
...ley gave his resigna-
...



**ROBERT WORLEY**

...leave Sealy," he said
...view afterward.

...75, has been the
...for just under two
...s last day will be Dec.
...y said he is going to a
...ntly smaller city"
...re in Texas but wasn't
...to say which city.
...n't looking for a job,
...uited me, very much
...id.

...Merrell, Sealy's city
...d a member of the
...d, said Worley will be
...d he wishes him well.

See WORLEY, page 5

...mber
...ases
...g fast
...ounty

E SOUTHERN
...sealynews.com

...ber of COVID-19
...rapidly rising in
...nty heading into

...lot good news for
...County.    DSHS
...t of State Health
...showing us with 85
...Still only 11 deaths.
...s far of 632 total
...nty Judge Tim
...rted on Monday.
...to the DSHS web-
...ional 15 cases were
...onday, which fol-
...Sunday.

...lt of rising cases,
...to end the mask
...r the county.
...mption is gone, back
...tory masks again,"
...v. 23.

...public schools in
...nty continue to
...cases. Sealy ISD
...tive cases and 17

See CASES, page 5

---

My job or terminate me."

His rebuttal of the council came during a special meeting held Monday night at the Hill Center. No one on the council responded to his remarks.

The meeting had been called for two reasons. The first was to review a new evaluation form for the city manager, which each council member and Merrell agreed was a better form than



Sealy City Manager Lloyd Merrell reads a statement during a special meeting of the city council Monday night in which he asked them to let him do his job or else terminate his employment.

He began his remarks by reviewing portions of the city charter that outline the duties of the city manager and the council and alleged violations by members of the council. One was having members of council deal directly with employees without first consulting him.

"Neither the city council, the

See MERRELL, page 5

---

## Former trucker lost his job over use of a CPAP machine

**By JOE SOUTHERN**
editor@sealynews.com

...ll Joe Gaggos wanted to do was keep his job as a truck driver for Walmart.

He underwent two radical surgeries that he now deems unnecessary, lost part of his vision in his right eye, and is now disabled and suffering from anxiety and post-traumatic stress disorder. Not only did he lose his job of 20 years, he says he is unemployable.

"I can't drive anymore... I'm a nervous wreck," he said.

His problems began in April of 2018. Being obese at 290 pounds and suffering from high blood pressure, he was told to take a sleep apnea test. He failed the test and was advised to get a CPAP (continuous positive airway pressure) machine to help him sleep better at night.

"I was not given instruction on how to use the device ... They did not fit the mask to my face," he said. "I had surgery to remove a portion of my nose due to skin cancer. It kept the mask from fitting properly. This caused air to be forced into my right eye and the next day I woke up with a red, irritated and very dry eye."

Over the next few nights he tried sealing the gap with different things but nothing worked.

"The eye irritation continued and worsened to the point where I began to lose

See BREATH, page 6



Joe Gaggos made a YouTube video outlining his issues trying to use a CPAP machine and pointing out that they do not work for everyone. Gaggos underwent two radical surgeries and struggled to use a CPAP machine to no avail in an attempt to keep his job as a truck driver for Walmart. He said he now suffers from anxiety and is unable to work due to the stress of his ordeal.

Courtesy photo

---

## ...asy of Lights celebration scaled back but still on

**By JOE SOUTHERN**
editor@sealynews.com

The Sealy City Council gave its OK for a very scaled back Fantasy of Lights cele...

council reached a compromise that will allow the Sealy Community Foundation to move forward with a small part of the festival, including the tree...

The parade route has been lengthened and social distancing and masks will be strongly encouraged. It will start Dec. 5 at 6...



I have tried repeatedly to comply with Walmart's policy about using the s[...]
Despite my best efforts the machines are not compatible with me. This forced me [...]
that could help heal my sleep apnea and decided on multiple, life altering surgerie[...]
cure the sleep apnea so that I would not have to fight with the CPAP machine. Th[...]
been a nightmare. I have been affected physically, emotionally, and mentally. I ha[...]
that all started with the use of this CPAP machine. This was exacerbated by the st[...]
of my job and the lack of help that I received from all parties involved. I feel that I[...]
worked with me from the very beginning and took my concerns seriously and actu[...]
masks and run sleep studies with the actual machine this situation could have bee[...]
refused to work with me and it caused permanent damage to my eye and psyche. [...]
I feel at work because of this situation and being forced to use a machine that I do[...]
been overwhelming for me. I am going to see a psychiatrist to determine if I am ev[...]
returning to work with this burden that I have been forced to carry. At the very lea[...]
sleep safe try harder to understand that patients are unique and need the extra h[...]
prevent issues like the ones I have been fighting. I also hope that my struggle will [...]
evaluate cases like mine on a case to case basis instead of their rigid stance on a [...]
size fits all. I just want to be helped with dealing with situation and someone to ac[...]
make this right. Please contact me to discuss this matter further. If there are any [...]
answers and detailed documentation of everything discussed.


Sincerely,



Joe Gaggos



Contact me by phone at (713) 594-3444

oxygen. I received a review that gave me recommendations for the BPAP machine and setting that would benefit me the most. I was given an ultimatum, continue to use the machine or be prevented from working. I continued to try to use the machine, despite still having issues, so that I could continue working.

While back at work on October 23, 2019 I was struggling with my blood pressure, weight gain, anxiety and confusion. I made an appointment with my doctor to discuss all that I was still going through because of this situation. On October 24, 2019 I had to meet with my safety manager in order to call Sleep Safe to get my results to share with my doctor. Because of the issues with Sleep Safe in the very beginning of this ordeal, I am prevented from contacting them without the Walmart safety manager to mediate. The records they sent were incomplete, and had to return the next day to receive the rest. The papers they did send showed that my studies have shown heart rate issues that I perceive to be related to all of the stress and anxiety that I have been having while dealing with this nightmare and using this machine that I don't need. To make matters worse, while I was already confused and worried about the results I was informed by Walmart that I was being investigated for supposedly scratching the truck I was driving. I spoke with Lance, the service manager, and asked if according to his expertise the scratch was new or old. He informed me that it was his opinion that it was not a recent scratch. I contacted Patrick, the Walmart safety manager, and asked him to contact my driving trainer, Frank, to see if the scratch was present during our training run. As of yet, I have not received a call back about the situation.

I received a note from Doctor Wang on November 8, 2019 that clearly states that I am intolerant of the CPAP and BPAP machines despite my continued effort to comply. He also states that per AASM guidelines therapy for sleep apnea is not indicated for an AHI lower than 15 and a patient that does not show symptoms. He advised that because of my scores and lack of symptoms I discontinue use of the machines until symptoms arise.

A sleep study report from November 15, 2019 confirmed that my AHI was only a 2.8 and my oxygen saturation never fell below 90%. The study concluded that therapy was not needed. I received a letter from Austin Heart LaGrange that also concluded that I am able to discontinue using the machines because of my normal diagnostic sleep studies.

On December 12, 2019 I went in to file for workmans compensation. I met with the general manager (Paul), manager (Rob), and the Human Resources manager (Sophia). I was trying to explain everything that I was dealing with in regards to the anxiety and stress that working and being forced to use these machines was causing me. I told them that I had been trying to use the machines but I just can't do it and offered to provide all medical documents to be evaluated for workers compensation. They were questioning me and trying to intimidate me, and even tried to accuse me of threatening them. I defused the situation by saying that I would never threaten them because we are all still a part of the Walmart family, and proceeded to leave the meeting. I was informed that my claim would be denied.

I have and appointment with Doctor Ashok Jain on January 15, 2020 to address all of the stress, anxiety and depression that I am dealing with because of the sporadic nature of my job and the unnecessary surgeries and apnea treatments that I have been subjected to over the course of this ordeal. This whole situation is deeply affecting my mental, emotional, and physical wellbeing and I need someone to actually try and help me.

surgery on July 26, 2018. I had to have a tonsillectomy, adenoidectomy, and nasal turbinate reduction. They also shaved off some of the back of my tongue and removed excess skin and tissue in an attempt to open up my throat so that the sleep apnea would be cured.

The doctor released me to return to work on August 21, 2018 without use of the sleep apnea machine. However, Walmart refused my doctor's recommendation and insisted that I get cleared by their doctor. On August 24, 2018 I underwent another sleep study. Due to the swelling that was still present from my surgery the month before I scored a 32 and was removed from work yet again.

On September 13, 2018 I went to an orthodontic surgeon, Dr. Maids, for a 3D cone beam evaluation. They discovered that I only had 5 centimeters of clearance in the back of my throat. They decided on another surgery to improve the clearance. On November 12, 2018 I underwent a very complex surgery. I had maxillomandibular advancement surgery, bilateral sagittal splint osteotomy, advancement via Lefort 1 osteotomy, and placement of maxillary and mandibular archbars. Basically, they broke my jaw, cut my gums and moved my teeth and jaw forward 1 centimeter.

I was in the hospital for 4 days. My mouth was wired shut and my face was swollen beyond recognition. I had to remain on a liquid diet for 2 months. I had to learn to chew and talk again, without any therapy. After 6 months I was able to begin to eat normally. In that time I lost 85 pounds and my neck size reduced to 16 inches. I am currently 205 pounds, but I have 20 pounds of extra skin that must be removed surgically. Due to the weight loss I was able to discontinue most of my medications. I no longer have to take blood pressure medications and I am being weaned off of thyroid and testosterone medications. On November 20, 2018 I received another 3D cone beam evaluation that showed the clearance was 19 centimeters and this clearance has continued to increase as I heal from the surgery. I was again released to go back to work on April 18, 2019.

However, Walmart safety manager and Human Resources contacted me on April 14, 2019 just days before I was set to return and informed me that they did not know what they were going to do with me yet. They eventually decided that I had to undergo another DOT physical in order to return to work.

On May 6, 2019 I passed my DOT physical and the DOT cleared me for 2 years. Because of the weight loss and surgeries they determined I did not need to use the sleep apnea machine. Walmart decided they would not allow me to come back to work without using the machine.

I had another sleep test on May 31, 2019 and they failed me for a score of 14. However the report indicated that I did not have any of the sleep apnea markers. The only reason I was failed was because I scored 1 point for hypopnea, which is shallow breathing. The other results such as my sleep efficiency I scored 90%, my oxygen level was 94%, and my pulse was 59. The doctor determined these were all normal scores for a sleeping person.

Despite receiving normal scores and approvals from my doctors and the Walmart DOT doctor Walmart still refused to let me go back to work without using the CPAP machine. I underwent another sleep study on June 30, 2019. This was the first sleep machine and adjusted it while I was there. During the course of the study different masks and setting to try to get it functioning properly for me with my mouth open, and this prevents the machine from prev...

Joe Gaggos Tept TD Attn
ss # 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
cpe # 2604286-1-1

Questions for Walmart. From the 1st night pressure to high complaining to Walmart safety & sleep safe driver's. Why 15 months after 2 major surgery, released from DOT physician ( Walmart), drew unemployment for 3months ( only because I wouldn't work until sleep study with machine) just to be tested? After testing wasn't told about reactions during sleeping (panic attacks) 1st night on machine? DR JAIN  was on a  weekly basis trying to extend to October 25 for medical leave ( no results)? Why did you tell unemployment (I quit) after receiving unemployment? Why did sedgwick and Paul Peterson GTM (May 14,2020) your extended to May 25,2020, 2 phone calls to sedgwick, 1 to Paul Peterson GTM ( 2 days later, terminated)? Common practice to ignore driver's health issue concerning his safety and others? Was this company policy for all driver's (required for employment) having issues with sleep apnea? Per independent study 2.8 ahi ? Forward please

Sent from the all new AOL app for Android

> On Mon, Dec 6, 2021 at 10:20 AM, Jackie Plaza
> <jackie.plaza@spielbergerlawgroup.com> wrote:
>
> Mr. Gaggos,
>
> Ms. Klepper will review all that has been submitted and let you if we need any additional information.
>
> Kind regards,
>
> **Jackie Plaza**
> Legal Assistant
> **Address:** 4890 W. Kennedy Blvd., Ste. 950 | Tampa, FL 33609
> **Tel.** (800) 965-1570 Ext. 128
> **Fax:** (866) 580-7499
> **Email:** jackie.plaza@spielbergerlawgroup.com
>
> This correspondence may contain information that is confidential, proprietary or & non-public personal information, as that term is defined in the Gramm-Leach-Bliley Act (collectively, Confidential Information). The Confidential Information is disclosed conditioned upon your agreement that you will treat all Confidential Information confidentially and in compliance with applicable law, ensure that such information is not used or disclosed except for the limited purpose for which it is being provided and will notify and cooperate with Spielberger Law Group, LLC. regarding any requested disclosure or any unauthorized disclosure or use of any Confidential Information. By accepting and reviewing the Confidential Information you agree to indemnify Spielberger Law Group, LLC. against any losses or expenses, including attorney's fees that Spielberger Law Group, LLC. may incur as a result of any unauthorized use or disclosure of the Confidential Information due to your acts or omissions. If this correspondence is received by a party other than the intended recipient, you are requested to immediately notify us of the erroneous delivery and return to us all information so delivered immediately.

**Fax:** (866) 580-7499
**Email:** jackie.plaza@spielbergerlawgroup.com

This correspondence may contain information that is confidential, proprietary or & non-public personal information, as that term is defined in the Gramm-Leach-Bliley Act (collectively, Confidential Information). The Confidential Information is disclosed conditioned upon your agreement that you will treat all Confidential Information confidentially and in compliance with applicable law, ensure that such information is not used or disclosed except for the limited purpose for which it is being provided and will notify and cooperate with Spielberger Law Group, LLC. regarding any requested disclosure or any unauthorized disclosure or use of any Confidential Information. By accepting and reviewing the Confidential Information you agree to indemnify Spielberger Law Group, LLC. against any losses or expenses, including attorney's fees that Spielberger Law Group, LLC. may incur as a result of any unauthorized use or disclosure of the Confidential Information due to your acts or omissions. If this correspondence is received by a party other than the intended recipient, you are requested to immediately notify us of the erroneous delivery and return to us all information so delivered immediately.

---

**From:** Donna <colonne2@aol.com>
**Sent:** Monday, December 6, 2021 11:09 AM
**To:** Jackie Plaza <jackie.plaza@spielbergerlawgroup.com>
**Cc:** Gabrielle Klepper <gabrielle.klepper@spielbergerlawgroup.com>
**Subject:** RE: Case Update (CLID: 2104242857, Gaggos, Joe)

*[handwritten: Joe Gaggos Text SSF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 Case II 2606286-1-1 To Attorney]*

The problem I'm having is writing, because of the emotional stress is like reliving it again. Day one they would not tested me on CPAP machine, Dr Klaus sent a fax to safety problems I'm having need testing,nothing prevailed, after 2 surgery, there DOT doctor said sleep apnea machine Not required. I drew unemployment for 3 months to force them to be tested. Then safety agreed to tested me. First night had panic attacks in my sleep, verified by sleep study hart rates 15 to 378 per minute, also technical reports severe night sweat. Then put on the machine for 3months to the point of suicide gained 30pound, blood pressure out of control finds out trying to take copy to his doctor appointment, I was accused of having and accident. So I'm having my hart check out, sleep study done. I go in person to work to apply for worker compensation, (Paul, Rob,Shopea) was trying to explain when Paul Peterson GTM verbally,so I left. Reported everything to safety, human resources, been given the run around ( everything document with Doctor appointment visit,text,phone records) on May 14,2020 had two phone calls to sedgwick, they informed me my extended to May 25,2020, and to Paul Peterson GTM he also informed me also. One last thing during this time I was drawing social security and medical leave from Walmart. They reported those earning as wags,  which counts against social security. Can you work with this. Let me know

Sent from the all new AOL app for Android

On Mon, Dec 6, 2021 at 9:08 AM, Jackie Plaza

<jackie.plaza@spielbergerlawgroup.com> wrote:

    Mr. Gaggos,

To JEFF HAMMOND, KEVEN AND ROXIE

My name is Joe Gaggos and I am a truck driver for Walmart. I have driven for Walmart for 19 years. I started in Porterville, California and worked there for 5 years. When Walmart opened in Sealy, Texas in 2005 I transferred there and was part of the start up crew as a set run driver. After 19 years working for Walmart I am no longer sure about what my position is with the company. I have been battling with health and policy issues and all I want is to resolve them so I can start working again.

On April 31, 2018 I took a CPAP sleep apnea test for Walmart. I had to take the apnea test because I was overweight and had high blood pressure. I weighed 290 pounds and had a neck thickness if 18 inches. I scored a 15.2 on the apnea test so they advised that I use a sleep apnea machine at night. That is when my real problems began.

On May 1, 2018 I was sent home to use the apnea machine for the first night. I was not given any instructions on how to use the device. They simply told me to open the box and follow the instructions that were included. They did not even fit the mask to my face. I had surgery to remove a portion of my nose due to skin cancer. It kept the mask from fitting properly. This caused air to be forced into my right eye and the next day I woke up with a red, irritate, and very dry eye. I tried different things to help the mask fit and seal properly, such as filling the gap with tissue paper and other materials, but nothing worked. The eye irritation continued and worsened to the point where I began to lose vision in my right eye.

I called Sleep Safe, the company that provided the machine numerous times. I also contacted the safety manager at Walmart. I complained about the issues I was having and tried to get someone to help me correct the situation. They all just told me I had to get used to the machine. It wasn't until after I was already removed from work that Sleep Safe finally  I came in to have a mask fitting, and this was after 6 weeks of trying to use the machine. I went and did the fitting and there was still no improvement. I continued trying to use the machine for 20 more days.

With no improvement I called Sleep Safe again. They were rude and belligerent. I asked to talk to the representative's boss and was connected. Instead of being met with concern and assistance I was met with hostility and neglect, they refused to listen or offer assistance with the issues. Instead he emailed my safety manager to report that I was having issues using the machine. I contacted my safety manager and he informed me that Sleep Safe said that, "I need to grow up and get used to it." WALMART SAFETY said that their hands were tied and there was nothing they could do about the situation. I was told that if I did not continue to use the machine despite the issues I was having I would be kept off work.

On June 14, 2018 I had a DOT physical. I failed the physical because of the loss of vision in my right eye that was caused by the CPAP machine. I was again taken out of work until I got glasses to improve my vision. I had never before needed glasses. The eye doctor, Dr. Griffith, informed me that the eye damage was irreversible and that I would now wear glasses permanently.

I was then sent to and ear, nose and throat specialist, Dr. Salzer, that recommended I get surgery to correct the sleep apnea so that I would not have to use the machine anymore. I underwent surgery on July 26, 2018. I had to have a tonsillectomy, adenoidectomy, and nasal turbinate reduction.

They also shaved off some of the back of my tongue and removed excess skin and tissue in an attempt to open up my throat so that the sleep apnea would be cured.

The doctor released me to return to work on August 21, 2018 without use of the sleep apnea machine. However, Walmart refused my doctor's recommendation and insisted that I get cleared by their doctor. On August 24, 2018 I underwent another sleep study. Due to the swelling that was still present from mu surgery the month before I scored a 32 and was removed from work yet again.

On September 13, 2018 I went to an orthodontic surgeon, Dr. Maids, for a 3D cone beam evaluation. They discovered that I only had 5 centimeters of clearance in the back of my throat. They decided on another surgery to improve the clearance. On November 12, 2018 I underwent a very complex surgery. I had maxillomandibular advancement surgery, bilateral sagittal splint osteotomy, advancement via Lefort 1 osteotomy, and placement of maxillary and mandibular archbars. Basically, they broke my jaw, cut my gums and moved my teeth and jaw forward 1 centimeter.

I was in the hospital for 4 days. My mouth was wired shut and my face was swollen beyond recognition. I had to remain on a liquid diet for 2 months. I had to learn to chew and talk again, without any therapy. After 6 months I was able to begin to eat normally. In that time I lost 85 pounds and my neck size reduced to 16 inches. I am currently 205 pounds, but I have 20 pounds of extra skin that must be removed surgically. Due to the weight loss I was able to discontinue most of my medications. I no longer have to take blood pressure medications and I am being weaned off of thyroid and testosterone medications. On November 20, 2018 I received another 3D cone beam evaluation that showed the clearance was 19 centimeters and this clearance has continued to increase as I heal from the surgery. I was again realeased to go back to work on April 8, 2019.

However, Walmart safety manager and Human Resources contacted me on April 14, 2019 just days before I was set to return and informed me that they did not know what they were going to do with me yet. They eventually decided that I had to undergo another DOT physical in order to return to work.

On May 6, 2019 I passed my DOT physical and the DOT cleared me for 2 years. Because of the weight loss and surgeries they determined I did not need to use the sleep apnea machine. Walmart decided they would not allow me to come back to work without using the machine.

I had another sleep test on May 31, 2019 and they failed me for a score of 14. However the report indicated that I did not have any of the sleep apnea markers. The only reason I was failed was because I scored 1 point for hypotenia, which is shallow breathing. The other results such as my sleep efficiency I scored 90%, my oxygen level was 94%, and my pulse was 59. The doctor determined these were all normal scores for a sleeping person.

After some research on sleep apnea I have discovered that there is a therapeutic option called V myofunctiono therapy that has a 40% success rate at reducing sleep apnea. This therapy used exercise to strengthen the throat and neck muscles. This option was not discussed with me before making me get two intense and possibly unnecessary surgeries. And still with the 2 surgeries and multiple doctors giving me clearance Walmart will not let me return to work without using the apnea machine that has already caused me more damage.

On June 9, 2019 I was told that I could return to work without the machine. 2 hours later I was called and told that I was put on standby again. This battle has been going on for over a year. I have received unemployment because they said that Walmart fired me for medical reasons. Walmart claims that I am still on the books. DOT examiners and other doctors have cleared me, but Walmart will not let me return because their walmart policy will not clear me to return without the machine. Even though I passed the DOT exam, they said Walmart has its own policies. They are having issues with their policy and procedures and it is costing me time and money. I would like an independent party to analyze my results to determine if I can be cleared to work without the machine. All I want to do is return to work without using this machine that I do not even need.

THANK YOU JOE GAGGOS 19 YEARS WITH WALMART

This was sent to Walmart manament on Jan 12, 2020 Have a Doctors appointment on Jan 15, 2020 at 9:00 am with psychatrist Dr Ashok Jain, md at Sealy TX, Phone # 281-302-6636, mental issues,

document enclosed
doctors notes
techician comments
request for withdrawal of application for social security
Log for what's happen to me.

Joe Gaggos 1-6-2020

P.S "need help" done every thing possible. Please follow report sent to Walmart management, and doctors note,

[illegible]